AIKEN COUNTY; Aiken County Public Service Authority, Plaintiffs–Appellees,

v.

BSP DIVISION OF ENVIROTECH COR-PORATION; Insurance Company of North America; Envirotech Corpora-tion, Defendant & Third Party Plain-tiff–Appellees,

v.

BAY–CON GENERAL, INC.; The Trav-elers Indemnity Company, Third Party Defendants–Appellants, and

Davis & Floyd Engineering, Inc., Third Party Defendant.

AIKEN COUNTY; Aiken County Public Service Authority, Plaintiffs–Appellees,

v.

BSP DIVISION OF ENVIROTECH COR-PORATION; Insurance Company of North America; Envirotech Corpora-tion, Defendant & Third Party Plain-tiff–Appellant,

v.

BAY–CON GENERAL, INC.; The Travel-ers Indemnity Company; Davis & Floyd Engineering, Inc., Third Party Defendants–Appellees.

Nos. 87–1011, 87–1012.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 4, 1988.

Decided Jan. 9, 1989.

Rehearing and Rehearing In Banc Denied Feb. 27, 1989.

Patrick Alan Thompson (S. Gregory Joy, Smith, Currie & Hancock, Atlanta, Ga., on brief), Robert Jeffery Aamoth (Jack N. Goodman, Pierson, Ball & Dowd, Washington, D.C., on brief), for appellants.

Donald Asendorf Harper (T.S. Stern, Jr., Haynsworth, Marion, McKay & Guerard, Greenville, S.C., on brief), Charles Porter, Columbia, S.C. (C. Alan Runyan, Hampton, S.C., McNair Law Firm, P.A., Charleston, S.C., on brief), for appellees.

Before MURNAGHAN, SPROUSE and WILKINS, Circuit Judges.

SPROUSE, Circuit Judge:

In 1974, Aiken County, South Carolina, and Aiken County Public Service Authority (hereinafter "Aiken") employed Davis & Floyd, a South Carolina engineering company, to design a wastewater treatment plant to cleanse community and industrially polluted water discharged into the Horse Creek Valley section of the Savannah River. Aiken chose Bay–Con General, Inc., a non-South Carolina corporation, to be the general contractor for construction of the twenty million dollar project. Bay–Con awarded the BSP Division of Envirotech Corporation, also a non-South Carolina corporation, a subcontract to provide and to install the heat treatment system of the plant. Travelers Indemnity Company provided Bay–Con its surety bond, and Insur-

ance Company of North America (hereinafter "INA") provided a bond for Envirotech.

In 1981, Aiken brought this diversity action demanding compensatory and punitive damages against Envirotech and its surety alleging breach of warranty, breach of contract, and fraud in supplying faulty equipment for the heat exchanger and other components of the heat treatment system. Envirotech counterclaimed against Aiken and impleaded Bay–Con, Travelers, and Davis & Floyd as third-party defendants. Bay–Con then filed a claim against Aiken. Aiken, in turn, amended its complaint to name Bay–Con and Travelers as direct defendants. Davis & Floyd and Bay–Con filed claims against each other and Envirotech. In addition, Aiken asserted a claim for indemnification against Davis & Floyd solely on Envirotech's claim.

After a court-approved delay, a fifty-two day bench trial began in January 1984, limited primarily to the issues of liability regarding the faulty heat exchanger system.[1] At the conclusion of the trial, the court, on November 24, 1986, awarded Aiken $2,865,500 in compensatory damages and $1,000,000 in punitive damages against Envirotech. Bay–Con was also held liable to Aiken for the compensatory damage award,[2] but the court held that Bay–Con was entitled to indemnification from Envirotech. Davis & Floyd, which had been impleaded by Envirotech and was a defendant of a cross-claim by Bay–Con was absolved of liability to those companies. Although not named as a defendant in Aiken's complaint, the district court *sua sponte* amended the complaint under the aegis of rule 15(b) of the Federal Rules of Civil Procedure to include Davis & Floyd as a principal defendant and absolved it of any liability to Aiken. *Aiken County v. BSP Division of Envirotech Corp.*, 657 F.Supp. 1339 (D.S.C.1986). This action by the court generated one of the issues in this appeal, *viz.*, whether diversity was impaired.

Envirotech appeals, contending principally that the district court was without jurisdiction due to a lack of complete diversity, and that the court erred in finding it liable for breach of contract and warranty, in computing compensatory damages, in finding that it committed fraud, in computing punitive damages, and in awarding attorneys' fees to Bay–Con and Davis & Floyd. Envirotech further argues that the district court's judgment should be reversed because the judge was guilty of trial misconduct in communicating *ex parte* with opposing counsel and in accepting and using proposed findings submitted unilaterally by opposing counsel. We affirm all of the district court's judgment except its *sua sponte* amendment of the complaint in order to enable it to adjudicate liability between Aiken and Davis & Floyd, its computation of damages, and its award of attorneys' fees to Davis & Floyd.

## I. FACTS

Aiken initiated the environmental project involved in this litigation after indications that the Horse Creek Valley area of South Carolina faced a serious water pollution problem. Davis & Floyd, Aiken's consulting engineer, designed a wastewater treatment facility comprising several systems within one plant for removing waste from the effluent of the plant's four major customers.[3] It was projected that about one

---

1. There were a number of other issues framed by the pleadings, but none are involved in this appeal because the trial court bifurcated the issues and tried only those involving the heat exchanger. The heat exchanger is an integral part of the heat treatment unit, which in turn is an integral part of the waste treatment plant. The adequacy of the heat exchanger's performance *vel non* shapes the controversy in this litigation. Because it is an integral component of the entire system, however, its replacement would require replacement of other components of the heat treatment system, and warranties, contracts, and representations concerning its performance must be understood from that perspective.

2. The two surety companies were held jointly liable with their respective principals, INA's liability being limited to the $2,070,399 of its bond plus post-judgment interest on that amount.

3. The four customers, who were the primary sources of the contaminated water, were the cities of Aiken and North Augusta, South Carolina, and two large textile mills, the Graniteville Company and the United Merchants and Manufacturing Company.

quarter of the waste would be domestic and three quarters industrial. The facility was designed to process twenty-two million gallons per day of effluent and was anticipated to be adequate to handle needs through the year 1995.

Aiken's dissatisfaction with the heat treatment component of the completed plant generated this lawsuit. An understanding of the malfunction in the heat treatment system that ultimately led the district court to award damages to compensate for its replacement, however, requires an understanding of the entire sewage treatment plant. We gain that understanding from the district court's description of the plant in its findings. The domestic and industrial effluent treated by the wastewater treatment plant enters the system through a bar screen with two-inch grids designed to catch large items of debris. It is then raised by large pumps and flows by gravity through the rest of the plant. It next passes through a smaller bar screen and grid chamber, which removes additional debris and sand, and from there goes to one of four primary clarifiers where the primary (thicker) sludge [4] is separated and pumped to holding tanks adjacent to the heat treatment facility. The remaining waste is aerated in one or more of the five large basins so that bacteria can break down the solids and make them more amenable to settling or floating. The aerated material is then pumped to one of four secondary clarifiers which separate the clean water and release it into the Savannah River. All of the sludge is then combined and pumped into the heat treatment unit through a grinder. In the heat treatment unit, the sludge flows through the inner pipe of the heat exchanger into a reactor where it is broken down and sterilized by heat and pressure. It is pumped back through the heat exchanger into decant tanks where it is further concentrated. From the decant tanks, the sludge is vacuum filtered to remove the water, which comprises more than ninety percent of the sludge. The process is designed to allow clean water to be discharged to the river and solid waste to be hauled to a landfill.

The purpose of treating the sludge with heat is to allow the sludge to be dewatered more easily and to sterilize it. The heating system principally is comprised of pipes and a heater (or reactor). The cold sludge is pumped from containers where it was collected to the heater (reactor). After it is sterilized and broken down, the hot sludge is pumped from the reactor through another pipe to the decant tanks. The design and the manufacture of this piping system, known as the heat exchange system, formed the basis for Aiken's action. The pipe through which the cold sludge is pumped to the reactor passes through the pipe through which the hot sludge is pumped from the reactor to the decant tanks. The cold sludge is thus immersed in hot flowing sludge and consequently heated before it enters the reactor. Conversely, of course, the flowing hot sludge has passing through it a pipe through which cold sludge is flowing and is consequently cooled. The inner pipe is approximately two and one-half inches in diameter, and the outer pipe is approximately four inches in diameter. The space between the two pipes (the annular space or the annulus) is five-eighths of an inch. The inner pipe is supported inside the outer pipe by small, curved metal spacers. Thus, the heat exchanger is simply a series of concentric tubes within tubes in which the sludge flows to and from the reactor. This heat exchanging process is useful because the sludge must be heated in the reactor, and the cost of supplying that heat is partially offset by using heat from the hot sludge leaving the reactor, which must be cooled anyway, to preheat the cold sludge going to the reactor. The sole purpose of the heat exchanger is to make the heating process more efficient and, therefore, more economical by transferring heat from the hot sludge to the cold sludge prior to the cold sludge entering the heating unit or reactor.

Envirotech's contract with Bay–Con called for it to design and to supply the

---

**4.** "Sludge" is the result of the solids collection process in a waste treatment plant.

thermal sludge conditioning system, including the heat treatment equipment and other related items, for $2,801,560. The heat treatment specifications required suppliers to demonstrate experience with the equipment or, in the alternative, to provide a performance bond to Aiken in lieu of experience. Envirotech accordingly obtained a bond from INA for $2,070,399 to guarantee the replacement of the heat treatment equipment in lieu of demonstrating its experience.

As noted, the central function in this system of a heat exchanger of any type is to preheat the cold sludge and to cool the hot sludge coming from the reactor. At the time Envirotech installed the heat treatment system in the Aiken plant, suppliers designed heat exchangers in various ways to accomplish this result. Envirotech designed and supplied for the Aiken plant the system we have described which is known as a "sludge-to-sludge" heat exchanger. The sludge-to-sludge design generated the problems leading to this litigation. The heavy sludge frequently caught on the "spacers" separating the inner and outer pipes, causing "plugging" in the outer pipes. Designs utilizing "sludge-to-water" (an alternate Envirotech process) or "modified sludge-to-sludge" (contained in a losing bid by Envirotech's sole competitor, Zimpro, Inc.) systems do not have that problem but are more expensive. The sludge-to-water system, for example, first contacts hot reactor effluent (inner tube) with water (outer tube) in one series of pipes and then contacts the heated water (outer tube) and reactor influent (inner tube) in a second series of pipes. Thus, only water passes through the annulus; however, considerably more tubing is required. Much of the trial testimony and the issues resulting from it concern Envirotech's knowledge *vel non* of the "plugging" characteristic of the unmodified sludge-to-sludge system and whether it purposefully supplied a system that could not perform satisfactorily solely to obtain a

competitive advantage in bidding on the contract.

The treatment plant first received wastewater in November 1979. Installation of the heat exchanger was completed in February 1980. It was tested in April 1980 and began operation several months later. By early 1981, the operational problems that matured into the breach of contract complaints we consider had become severe. They were caused by a blocking or plugging in the annular space of the outer pipe which carried the hot sludge from the reactor. This plugging in turn was caused by pieces of ground synthetic fibers and latex-like and other materials attaching to the spacers in the annular space. After these materials accumulated in the annulus, the sludge flow was retarded, and it was necessary to stop the operation and to clean the pipes by flushing them with water and steam. As the problems continued, Aiken, concerned with the current efficiency and the ability of the system to meet its anticipated increased demands for wastewater treatment expected by the year 1995,[5] brought this action against Envirotech demanding damages.

## II. THE JURISDICTION ISSUE

■ Envirotech contends that the district court lacked jurisdiction to render any judgment, claiming that, by its post-trial rule 15(b) action resolving the controversy between two South Carolina citizens (Aiken and Davis & Floyd), it destroyed the diversity upon which jurisdiction over the case was based. We disagree. In our view, the district court's *sua sponte* rule 15(b) amendment was improper and void, so it retained complete diversity jurisdiction.

There is no question that diversity existed throughout the trial, satisfying the requirements of *Strawbridge v. Curtis*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806), and its progeny. The original complaint simply defined an action by Aiken, a South Carolina entity, against Envirotech and its surety, both non-South Carolina defend-

---

5. The plant has treated an average of ten million gallons per day since it began receiving wastewater. It was believed that there could possibly be a need for it to reach its design volume of twenty million gallons per day by 1995.

ants. Aiken later amended its complaint to include two other diverse defendants, Bay–Con and its surety. The amended complaint, therefore, simply named one plaintiff against four diverse defendants. In the interim Envirotech, in addition to its counterclaim, impleaded Bay–Con and Davis & Floyd as third-party defendants. This invoked ancillary jurisdiction and did not offend the *Strawbridge* requirement of complete diversity. *See Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). Likewise, the cross-claims of Davis & Floyd and Bay–Con against each other and their action against Envirotech did not violate the rule requiring complete diversity. After Envirotech's counterclaim against Aiken, the latter filed an action for indemnity against Davis & Floyd (like Aiken, a South Carolina entity) seeking indemnification in the event Aiken was held liable to Envirotech on its counterclaim. This again did not offend the rule requiring complete diversity.

To say that the pleadings created a complex procedural web, however, is a gross understatement. Sifting through the evidence involved a substantial chore, but the substantive issues in the fifty-two day trial were comparatively simple. Because the district court bifurcated the trial, the issues presented were basically whether Envirotech manufactured and installed faulty elements of a heat treatment unit, whether its conduct amounted to fraud, and what amount, if any, of compensatory and punitive damages should be awarded. Much of Envirotech's evidence was introduced to support its general denial. It also defended, however, by asserting that Davis & Floyd had negligently designed the heat treatment units. Claiming the status of a third-party beneficiary to the contract between Aiken and Davis & Floyd, Envirotech asserted that Davis & Floyd breached its contract with Aiken by designing an inadequate system. These claims were never asserted by Aiken either in its pleadings or in the evidence it introduced at trial.

Against that procedural background, the jurisdictional issue that we now confront

first arose during the trial. It surfaced when counsel for Davis & Floyd attempted to cross-examine an Envirotech witness concerning the malfunctions of the heat treatment equipment furnished by Envirotech. Envirotech objected, complaining that this was properly a part of Aiken's principal case and that Aiken had completed its presentation of evidence. In a somewhat confused colloquy between the court and all of the attorneys, Aiken's counsel informed the court:

Prior to going to trial some time in the summer of 1982, we discussed that pleading and we agreed, Mr. Porter and I, on behalf of our clients that we would ask this Court to resolve all disputes as between Mr. Porter [Davis & Floyd] and I [Aiken], so I won't have to come in at that point and amend it. He agreed not to object and I agreed at that point in time that I wouldn't come in and seek any kind of amendment at that point. We will just ask the Court to conform the pleadings to the proof, but he and I have a written letter that sets forth in one paragraph that all claims between us will be resolved. It's very similar to the formal agreement Mr. Killian and Mr.— Envirotech and Bay–Con have that all disputes between them will be resolved in this litigation.

The substantive relevance of the discussed evidence was not important because Davis & Floyd's counsel withdrew the proffered question. The description of the private non-trial agreement between counsel for Aiken and counsel for Davis & Floyd, however, produced the germ from which the jurisdictional problem we consider developed.

A number of trial days later, after the conclusion of the evidence, Aiken's attorney, in discussing the posture of the issues, obliquely referred to the part of colloquy we have quoted:

I, [Aiken] of course, would move either at this time, or in the morning, to conform the pleadings to proof, and allow me to assert cause of action against Mr. Porter [Davis & Floyd] for negligence and breach of contract, if any. And this

is something that we discussed on the record. You asked Mr. Porter if that was agreeable, that we would decide those issues, based on their cross claims against him. And he agreed that you would.

There isn't any question that that issue has been tried by Mr. Killian, [Envirotech] as to whether or not Davis & Floyd is liable over to me [Aiken], either jointly or severally. . . .

There was no other discussion of the proposed motion nor any further statements by any parties concerning possibly existing direct issues between Aiken and Davis & Floyd.

The district court, however, in its written opinion issued almost two years after the conclusion of the trial, stated for the first time and with little elaboration that it was amending Envirotech's complaint to include a direct claim against Davis & Floyd. The court at that point in its opinion was discussing Davis & Floyd's motion for costs and attorneys' fees to be awarded against Envirotech. In justifying an award under the rationale of *Campus Sweater & Sportswear Co. v. M.B. Kahn Construction Co.*, 515 F.Supp. 64 (D.S.C.1979), *aff'd*, 644 F.2d 877 (4th Cir.1981), the court in a footnote ruled that Davis & Floyd was a direct party:

Although it was Envirotech that first brought Davis & Floyd into this suit *via* Rule 14 of the Federal Rules of Civil Procedure, I do not believe *Campus Sweater* is inapplicable merely because Envirotech beat Aiken County to the punch. Aiken County did later make a claim against Davis & Floyd on July 7, 1981. Even though that pleading speaks only in terms of indemnification for Aiken County's liability on issues other than the heat exchanger one, the parties had an understanding that the pleading would encompass a claim by Aiken County against Davis & Floyd for its role in providing the heat exchanger. (Tr. 5/10/84 at 134–37). This latter claim was actually litigated, and the court considers the pleadings amended to conform to the evidence on the issue. Fed.R.Civ. P. 15(b).

657 F.Supp. at 1362 n. 43.

Rule 15(b) of the Federal Rules of Civil Procedure provides:

Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

Rule 15(b) amendments, of course, are to be liberally allowed in the exercise of the trial court's discretion. In our view, however, no rationale of liberality can justify the district court's action *sua sponte* amending Aiken's complaint, and because we find that it abused its discretion in doing so, we hold that the attempted amendment was ineffective. Nowhere in the pleadings is there a claim by Aiken against Davis & Floyd, other than for indemnification. At no time during the trial did Aiken assert direct liability. A careful search of this voluminous record uncovers no evidence introduced by Aiken to establish liability flowing to it from Davis & Floyd. To the contrary, the conduct of those two parties before, during, and after the trial consistently and uniformly presented their claims in tandem. It is true that there was evidence of breaches of

Davis & Floyd's duty to Aiken, but this was presented by Envirotech in support of its cross-claim against Davis & Floyd. In short, there was simply no evidence to satisfy the language of rule 15(b) permitting such "amendment of the pleadings as may be necessary to cause them to conform to the evidence."

Envirotech, in support of its cross-claim against Davis & Floyd, presented evidence that the latter negligently designed the plans for the heat treatment system. Interlocking evidence of this nature, however, is inevitable in any litigation involving complex party trial alignment such as in this action. Even in trials involving much simpler procedural postures, the evidence produced by one set of opposing litigants may be probative in resolving numerous issues that could conceivably affect other parties involved in different capacities within the suit. In our view, however, rule 15(b) does not contemplate that evidence introduced by opposing parties on one issue may be advanced as justification for conforming the pleadings between two different parties on issues they chose not to litigate either by pleading or by advancing evidence. *See International Harvester Credit Corp. v. East Coast Truck & R.V. Sales*, 547 F.2d 888, 890 (5th Cir.1977); *see also Lynch v. Dukakis*, 719 F.2d 504, 508–09 (1st Cir.1983); *Vargas v. McNamara*, 608 F.2d 15, 18 n. 3 (1st Cir.1979).[6] The application of that rationale to this case is not altered by the extra-judicial private agreement between Aiken and Davis & Floyd that, if any controversy developed between them at trial, the parties would settle the controversy by accepting the trial court's resolution of Envirotech's cross-claim against Davis & Floyd.[7]

### III. THE CONTRACT BREACH

Section 32 of the contract provides in pertinent part:

Warranties and Guarantees. The Subcontractor [Envirotech] warrants to Bay[-Con] and the owner ... that all of the Work will be of good quality, ... will be free from faults and defects, will be in conformance with the requirements of this Subcontract and of the Prime Contract, and will function as intended by the designer of the Work....

Section 15S.1 of the contract's specifications provides:

the systems furnished ... shall be placed in operation ready to operate continuously on a 24 hour per day basis with not more than 15 percent of total time required for maintenance and repairs.

Section 15S.7.1 requires that the heat exchangers "shall be capable of being operat-

6. For that matter, we doubt whether rule 15(b) should ever be used after the conclusion of the trial to destroy proper diversity jurisdiction that had existed throughout the trial. We have no doubt that, in the very least, we can consider this circumstance in determining whether a district court has abused its discretion in making such a post-trial rule 15(b) amendment in the guise of conforming the pleadings to the evidence.

7. Despite Envirotech's protestations to the contrary, it has demonstrated no prejudice to its rights at trial arising from the agreement. It was not inhibited in any presentation of evidence and, even on appeal, cannot demonstrate how it would have proceeded differently if it had been aware of the agreement earlier. Aiken and Davis & Floyd possessed a commonality of interest against Envirotech exhibited throughout the trial—focusing on establishing Envirotech's culpability in furnishing a faulty heat treatment system. This was evident not only in their pleadings and evidentiary presenta-

tions, but also in the trial court's acceptance of their status as aligned parties and its restrictions of their trial conduct to conform to that status.

Although not controlling, there is yet another circumstance that suggests the absence of any real prejudice. If the attempted rule 15(b) amendment had been valid, we, of course, would have reversed the complete judgment of the district court and remanded the case. On remand, the district court could have, and undoubtedly would have, simply eliminated Davis & Floyd as a party and adopted the evidence of the first trial which had been introduced between properly diverse parties. *See Horn v. Lockhart*, 84 U.S. (17 Wall) 570, 21 L.Ed. 657 (1873); *Hill v. Western Electric Co.*, 672 F.2d 381, 388 (4th Cir.), *cert. denied*, 459 U.S. 981, 103 S.Ct. 318, 74 L.Ed.2d 294 (1982); *Weaver v. Marcus*, 165 F.2d 862 (4th Cir.1948). Envirotech would then appeal the resulting judgment. Because there was no evidence presented by or against Davis & Floyd on a direct claim against it by Aiken, the evidence obviously would be the same as that which we now review.

ed with all automatic and safety features functioning."

■■■■ The district court interpreted section 15S.7.1 as requiring the system to operate automatically. *Envirotech* contends that the only requirement was that it be "capable" of operating automatically and that the proof that Aiken did not operate it automatically did not necessarily establish that it was incapable of doing so.[8] The district court interpreted section 15S.1 of the specifications as requiring that the system function with less than fifteen percent of its operating time used for maintenance and repair. *Envirotech* argues that this restriction was intended to be measured by fifteen percent of each calendar day.[9] We agree with the district court's interpretation of both sections and affirm its ruling that Envirotech breached these two sections of the contract.

It defies credulity to believe that when the parties contracted for an automatic system they intended that the system only be "capable" of being automatic in some abstract sense. There was substantial evidence to support the district court's finding that the system did not perform automatically.[10] Likewise, the plain language of section 15S.7.1 indicates that the parties

contemplated that Aiken would be furnished a system which would not lose more than fifteen percent of its operating time by the requirements of maintenance and repair.[11] Nor is there any merit to Envirotech's argument that the district court was clearly erroneous in factually finding that the unit was shut down for maintenance and repair for more than fifteen percent of its operating time. Ron Bibb, Aiken's chief of operations for the Horse Creek facility, testified and presented documentary evidence that time spent cleaning (exclusive of other maintenance and repairs) either a component of the heat treatment system, (such as the heat exchangers) or the total system ranged from fourteen to forty-one percent of operating time in five months examined in 1981 and 1982. Although there were some discrepancies in Bibb's testimony, the court applied a "liberal interpretation of the performance criteria" in assessing the Bibb study from Bibb's testimony. It calculated the percentage of maintenance hours as a percentage of operating hours *plus* maintenance hours. The addition of maintenance hours to operating hours to form a larger base of total operating hours resulted in a calculation of time spent on maintenance for October through

8. Envirotech also contends that the evidence on which the district court based its finding that the system could not perform automatically does not in fact support its finding. Envirotech cites the testimony of Davis & Floyd employee Ron Kelly that, in compiling the data on which his testimony was based, *see infra* note 10, he did not distinguish absence of automatic operation caused by Envirotech's equipment from that caused by factors outside the control of Envirotech's equipment. Envirotech contends also that, in using such data as supplied by Kelly at all, the district court implicitly and incorrectly accepted Kelly's definition of "unsatisfactory" operation, a definition that did encompass non-automatic operation, but that, according to Kelly's testimony, was created *ex nihilo* by Kelly and Davis & Floyd without regard to the contract.

9. Envirotech argues further that, even if the provision were intended to read "total [operating] time," in fact greater than 15 percent of total operating time was not *required* for maintenance and repairs because such work could have been done when the equipment would not have been operating anyway because of lack of sludge.

10. Davis & Floyd employee Ron Kelly testified concerning his analysis of the heat treatment system's operation from February through June 1983. Kelly termed the system's operation "satisfactory" for 48 percent of the operating time. Criteria for satisfactory operation included no manual functions, proper temperature in the reactor, and a proper level of sludge in the reactor vessel. He testified that he looked to whether the heat treatment system was "actually automatically being controlled."

Aiken chief of operations Ron Bibb testified as to periods during which the system did not operate in a sustained automatic mode, and Jerry Timmons, Davis & Floyd's Vice–President, testified that the system "does not operate automatically." Davis & Floyd refused to certify the heat treatment system because, among other factors, it could not function automatically.

11. It is not necessary to resort to the evidence concerning the parties' understanding of this interpretation because we find the contract unambiguous.

December 1983 of thirty-six to forty-two percent of the total time. In October, for example, the heat treatment system was cleaned, maintained, or repaired a total of 139.25 hours, while operating on sludge only 194 hours.

During trial, in May 1984, Envirotech proffered an expert witness who recalculated the 1983 Bibb data, prepared by Bibb at the court's request during trial, to show that maintenance time was well below fifteen percent of total operating time. Envirotech had designated him orally in July 1983 and then informally by letter in November 1983 (a date considered to be timely by the court). Such informal practice had previously been followed by the parties. In September 1983, however, Aiken had put Envirotech on notice that it would no longer agree to the informal practice and would insist on compliance with the court's rules concerning designation. Envirotech formally designated the expert in December 1983, a date that the court considered to be too late. The court sanctioned Envirotech by refusing to accept the expert's testimony. This ruling, of course, rested in the sound discretion of the trial court. *See Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 369 (4th Cir.1986) (listing five factors that must be weighed in analyzing whether the exercise of discretion was proper). We cannot say that the district court abused its discretion.

In sum, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous [under Fed.R.Civ.P. 52(a) ]," *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Here, although there was evidence in support of both positions such that a decision either way would not be clearly erroneous, *see Babb v. Olney Paint Co.*, 764 F.2d 240, 243 (4th Cir.1985), we think there was substantial evidence to support the trial court's finding that the plant was closed for more than fifteen percent of its operational time due to the malfunction of the heat exchanger.

## IV. THE LATEX AFFIRMATIVE DEFENSE

■ It was established at trial that latex-like material comprised a considerable part of the material that collected on the annular spacers. We find no merit, however, in Envirotech's contention that the district court erred in rejecting its affirmative defense asserting that this was an unanticipated factor causing the "plugging." The district court found on substantial evidence that the presence of latex in the wastewaters of the two textile mills either was or should have been contemplated by the parties. For that matter, there was sufficient evidence to support the conclusion that the latex was not the sole causative factor in the plugging.

In 1973, Davis & Floyd sent Envirotech a five gallon sample composed of wastewater from the textile companies and other dischargers for which the Horse Creek facility would be designed. Envirotech reported to Davis & Floyd that the wastewater contained high molecular weight material, which Aiken's expert testified would include acetates.

Davis & Floyd issued a preliminary engineering report on the Horse Creek project in 1974. The report described the waste to be treated as a "combination of textile waste and domestic waste" and cited a treatise on industrial pollution. The treatise described how, in the finishing process for textiles, polyvinyl acetate and polyvinyl alcohol are removed from synthetic fibers. Davis & Floyd's 1974 report expressly mentioned that the industrial waste expected was "primarily textile dyeing and finishing types."

The 1974 preliminary engineering report also stated, however, that "[t]here should be no significant concentrations of materials resistant to biological degradation contained in the combined waste." Both Envirotech's and Aiken's experts testified that latex is generally resistant to biological degradation. An expert for Envirotech calculated that roughly one percent of the aggregate waste and five percent of the nonvolatile solids in the waste were latex.

Experts testified concerning the prevalence of latex in textile wastewater. Envirotech's expert testified that polyvinyl alcohol had been used in the textile industry for the previous ten to fifteen years. Aiken's expert in textile waste testified that he "would be surprised" if a textile mill's effluent did not contain fibers, polyvinyl alcohol, and polyvinyl acetates. The same expert noted that no general change had occurred in textile discharges in the region between 1977 and 1983, and he analyzed the textile discharges to the Horse Creek facility as "quite usual." The same expert said that polyvinyls should be expected in textile waste and that specifications for a textile treatment plant would normally list only atypical wastes. An Aiken employee testified that he saw nothing in Envirotech's operating and maintenance manual for the heat treatment system that restricted the type of sludge that could be treated. There is no evidence that, prior to the operation of the plant, Envirotech ever stated that its heat exchanger was unable to tolerate sludge containing latex.

## V. COMPENSATORY DAMAGES

Section 15S.16 of the contract's specifications provides:

> In the event that the sludge processing system cannot be operated in a practical manner, even with corrective changes, the Owner shall have the option of having the Contractor and equipment supplier remove the entire system at no cost to the Owner or to allow further revisions and/or replacements.

The district court computed Aiken's compensatory damages to be $2,865,500. It first concluded that Aiken was entitled to reimbursement for the cost of replacing the entire heat treatment unit. It arrived at the amount of damages by considering the testimony of Dave Tobin, a Zimpro sales representative, relating to Zimpro's 1976 offering bid of $2,650,000 to furnish a heat treatment system. A Davis & Floyd employee estimated that the charges for supervising the replacement of the heat treatment unit would be $200,000. A contractor's representative testified that it would cost $15,500 to dismantle and to remove the existing equipment.[12] The court adopted Zimpro's 1976 bid of $2,650,000 as a basis for calculating replacement cost of the entire heat treatment unit, added to it $200,000 and $15,500, and fixed the compensatory damages at $2,865,500.[13]

In our view, this assessment of damages was speculative at best and ignored probative trial evidence. The $2,650,000 figure represents Tobin's testimony as to what Zimpro would have charged in 1976 for a complete heat treatment system. Envirotech asserts, however, that that figure includes far more than the heat treatment system. In any event, the agreed-upon value of Envirotech's heat treatment system was $563,626. Indeed, although the district court stated in its opinion that it was using a figure that had been decreased by the value of existing equipment compatible with the Zimpro system and the salvage value of the remainder, it actually did not do so. Tobin testified that there were several compatible pieces of equipment. The

12. This cost includes an unspecified amount for the value of the removed equipment. It is unclear whether that value is scrap value.

13. South Carolina law recognizes the doctrine of substantial performance, where partial performance provides substantially all that was bargained for and is of such a nature that it cannot be returned. The law allows for a setoff in order to achieve justice in such a case. *Diamond Swimming Pool Co. v. Broome*, 252 S.C. 379, 166 S.E.2d 308, 311 (1969). The district court, however, refused to deduct any amount from the total replacement cost for the use that Aiken has thus far received from the equipment. In contrast to the action of the court in *Campus Sweater & Sportswear Co. v. M.B. Kahn Construction Co.*, 515 F.Supp. 64 (D.S.C.1979) (replacement damages for roof offset by value of its leaky performance), *aff'd*, 644 F.2d 877 (4th Cir.1981), the district court found the use here to have been troublesome, inefficient, and unsatisfactory, therefore precluding any offset; it considered that performance as not meeting the *"operated in a practical manner" requirement* of the contract specifications. We agree with the district court and reject Envirotech's contentions that, since Aiken used the equipment to process all influent sludge and since manual versus automatic operation required minimal additional effort at no additional cost to Aiken, the equipment did meet the parties' contemplation of practical operation.

evidence also reflects that on September 26 and October 4, 1977, in internal Envirotech documents whose author was postured such that a high estimate would support his position, it was estimated that the post-installation cost of replacement with a Zimpro system would be approximately one million dollars. An apparently more thorough analysis, in a January 11, 1980, document cited by the district court in another context, estimated it to be in the range $700,000 to $1,112,000, most likely $900,000. The district court gave no indication that it considered this evidence in its assessment of damages. Finally, the $200,000 estimate of supervision costs was based on a percentage of the cost of the system and took that cost to be $6,000,000, rather than $2,650,000.

> While proof, with mathematical certainty, of the amount of loss or damage is not required, in order for damages to be recoverable the evidence should be such as to enable the court or jury to determine the amount thereof with reasonable certainty or accuracy. Neither the existence, causation nor amount of damages can be left to conjecture, guess or speculation.

*Gray v. Southern Facilities*, 256 S.C. 558, 183 S.E.2d 438, 444 (1971) (principle reasserted in *Whisenant v. James Island Corp.*, 277 S.C. 10, 281 S.E.2d 794, 796 (1981)). Because the district court's assessment of damages does not meet these requirements, we remand the case to it for more certain proof of damages. *See Piggy Park Enterprises v. Schofield*, 251 S.C. 385, 162 S.E.2d 705, 708 (1968).

■ Finally, in the compensatory damage context, Envirotech claims that it is liable for only liquidated damages and relies on the following language in the remedy paragraph of section 15S.16 of the contract:

> If the system is operable but does not meet the power and fuel design requirements, or in the event that the performance tests [14] are not concluded, the full

amount of [$50,000] liquidated damages shall be retained unless the tests are not concluded due to failure of the Owner to perform.

If that were the complete contract language on this point of damages, Envirotech might have made a valid point. The entire remedy portion of section 15S.16, however, reads:

> The Contractor and equipment supplier shall have full opportunity to make whatever corrective changes are required and the testing shall be repeated in the manner approved until satisfactory results are obtained. In the event that the sludge processing system cannot be operated in a practical manner, even with corrective changes, the Owner shall have the option of having the Contractor and equipment supplier remove the entire system at no cost to the Owner or to allow further revisions and/or replacements. If the system is operable but does not meet the power and fuel design requirements, or in the event that the performance tests are not concluded, the full amount of liquidated damages shall be retained unless the tests are not concluded due to failure of the Owner to perform.

Read as a whole, this paragraph reflects that the liquidated damage language pertains only to the power and fuel design.

## VI. ENVIROTECH'S FRAUD

■ The district court found that Envirotech was guilty of fraud in representing to Davis & Floyd that it had tested a sludge-to-sludge system and that the system performed adequately. Envirotech argues on appeal that the district court committed both factual and legal error in reaching this conclusion.

Aiken provided Bay–Con with specifications drawn by Davis & Floyd, which in turn were provided to Envirotech. Envirotech's only competitor in selling and installing heat exchangers for wastewater treat-

---

**14.** The performance tests included a requirement that "[a]ll units [of the thermal conditioning system] perform smoothly, reliably, accurately, and at their rated capacities as a system" and specifically included the requirement of section 15S.7.1 (above) regarding automatic operation.

ment facilities was Zimpro, which was also its sole competitor for the Aiken contract. Envirotech had previously encountered irremediable plugging problems with a sludge-to-sludge system it had installed for a customer in 1969. Thereafter, it supplied only sludge-to-water systems; Zimpro supplied sludge-to-sludge units modified by features which utilized a nitric acid wash and injected air and water into the sludge to prevent the sludge from clogging or plugging the annular space.[15] The specifications indicated heat exchangers other than the ordinary sludge-to-sludge type ultimately supplied by Envirotech. Envirotech, in its bid to Bay–Con, indicated that it would supply a sludge-to-sludge unit, not utilizing air. The contract between Envirotech and Bay–Con incorporated by reference both the terms of the original specifications and the terms of Envirotech's bid. Envirotech had the option, therefore, to supply one of three heat exchangers, including a sludge-to-sludge unit without air injection.

After contracts were finalized between Envirotech and Bay–Con in March 1977 and Bay–Con and Aiken in April 1977, Envirotech continued to evaluate potential heat exchanger systems. In late June 1977, Envirotech met with Davis & Floyd officials and advised them that it would decide upon a heat exchanger system by the end of July. A somewhat puzzling scenario then occurred within Envirotech's engineering and executive organizations.

First, Envirotech's Engineering Department issued an internal report on July 22, 1977, recommending a sludge-to-water heat exchanger for Aiken. The Engineering report observed that a sludge-to-sludge system would require a proven solvent such as

nitric acid to clean the annulus,[16] which would entail the added expense of all stainless steel pipes. On July 26, 1977, Envirotech's president decided that the Engineering Department's preference for a sludge-to-water heat exchanger would be overruled unless Engineering expressed strong objections. Envirotech informed Davis & Floyd of its choice on July 28, 1977, and stated that work was in progress on spacer designs to minimize the potential for plugging in the annulus of the sludge-to-sludge system.[17]

Through the summer and fall of 1977, Envirotech executives stressed to each other in internal documents the need for developing and testing spacers for the Aiken heat exchanger. Envirotech engineers and executives also urged that the hydrochloric acid proposed as a cleaning solvent for the carbon steel pipes of the sludge-to-sludge system be tested for its effectiveness. Financial and time constraints, however, led Envirotech in October 1977 to forego testing of the spacer design selected for Aiken. Envirotech decided also to rely on manufacturers' representations concerning the effectiveness of hydrochloric acid rather than conducting its own tests of the solvent.

Davis & Floyd, Bay–Con, and Envirotech met for three days in late February 1978 to review Envirotech's progress and plans for the Aiken project. Davis & Floyd's president testified that, at the meeting, Envirotech's president took him aside and said, "we have tested this equipment. We don't have any engineering problems." Envirotech contended at the meeting that a change order was not necessary for Envirotech's implementation of a sludge-to-sludge exchanger and its other equipment. Its meeting notes showed that it "provided a

15. In order to accommodate the injection of nitric acid, the pipes of the heat exchanger must be composed of stainless steel because the acid would corrode carbon steel. The alternative sludge-to-water and modified sludge-to-sludge systems were more expensive than the orthodox sludge-to-sludge system and could not be bid competitively against a bid based on installing the ordinary sludge-to-sludge system.

16. Plugging was a major concern. Engineering supported its concern by indicating that a fiberglass and two textile plants would be contribu-

tors and that the sewage would have a high fiber content.

17. Envirotech also indicated that it would be submitting requests for deviations, to be incorporated into a change order, regarding the cleaning system, compressor, and odor control scrubbers. In its notes of a conference between Envirotech and Davis & Floyd, Envirotech requested that Davis & Floyd contact it regarding any errors or omissions in the notes.

list of the differences between [Envirotech's] system and equipment and the specified system for [Davis & Floyd's] use in preparing a change order if [Davis & Floyd] determined it was required." [18]

In this list of February 24, 1978, Envirotech summarized the differences between its sludge-to-sludge system and the Zimpro wet air oxidation system (one of those specified by Davis & Floyd when bids were accepted in 1976). Envirotech stated it would "furnish a vertical sludge-to-sludge heat exchanger equal in performance and in accordance to the specifications for the vertical heat exchanger specified for the wet air oxidation system except materials of construction will be a combination of carbon and stainless steel." Envirotech further stated that "[t]he specified nitric acid cleaning system would be detrimental to the materials of construction used. [Envirotech's] practice is to use an inhibited hydrochloric acid solution and our experience has been that this system does a satisfactory job of cleaning the exchanger." These and other changes in the heat treatment system were incorporated into a change order agreed to by Bay–Con, Aiken, and Davis & Floyd on March 3, 1978.

We think this is ample evidence to support the district court's finding that Envirotech's executives rejected the advice of their engineers and constructed a device based on a sludge-to-sludge system. It reported to Bay–Con that it had determined that the system is made to work successfully by injecting hydrochloric acid into the sludge. In fact, the test had been rejected because of time, manpower, and funding

problems. Based on these representations, Davis & Floyd altered the specifications to include the sludge-to-sludge system that was eventually installed by Envirotech, thereby bringing the specifications in line with the contract. Quite apart from the specific evidence supporting the finding of direct and specific misrepresentation, undisputed evidence presented a picture of Envirotech's executives striving to obtain an advantage first by saving the expense necessary to test the sludge-to-sludge system and then by bidding a sludge-to-sludge system that they knew was cheaper and contained inherent defects.

Envirotech argues, however, that even if these trial court findings are assumed to be correct, Envirotech's actions did not fit the pattern of conduct defined as fraud by the South Carolina Supreme Court.

In order to recover in an action for fraud and deceit, based upon misrepresentation, the following elements must be shown by clear, cogent and convincing evidence: (1) a representation; (2) its falsity; (3) its materialty; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; (9) the hearer's consequent and proximate injury. Failure to prove any one of the foregoing elements is fatal to recovery. *M.B. Kahn Construction Co. v. South Carolina National Bank of Charleston,* 275 S.C. 381, 271 S.E.2d 414, 415 (1980). [19] Where a party to a transaction conceals

---

**18.** The "specified system" refers to the systems originally specified by Davis and Floyd, *i.e.,* the systems incorporated by reference into the Envirotech–Bay–Con contract along with the sludge-to-sludge system ultimately supplied by Envirotech.

**19.** South Carolina also recognizes an action for breach of contract accompanied by a fraudulent act, with the following elements: (1) a breach of contract; (2) fraudulent intent relating to the breaching of the contract and not merely to its making; and (3) a fraudulent act accompanying the breach. The fraudulent act is any act characterized by dishonesty in fact, unfair dealing, or the unlawful appropriation of another's prop-

erty by design. *Scott v. Mid Carolina Homes,* 293 S.C. 191, 359 S.E.2d 291, 294 (App.1987); *Harper v. Ethridge,* 290 S.C. 112, 118, 348 S.E.2d 374, 378 (App.1986); *Floyd v. Country Squire Mobile Homes,* 287 S.C. 51, 53, 336 S.E.2d 502, 503–04 (App.1985). In order to recover punitive damages for breach of contract, the plaintiff must show the breach was accomplished with a fraudulent intention and was accompanied by a fraudulent act. This fraudulent act, although separate and distinct from the act(s) constituting the breach, must accompany the breach and not be too remote in either time or character. *Smith v. Canal Ins. Co.,* 275 S.C. 256, 260, 269 S.E.2d 348, 350 (1980).

some material fact within his own knowledge, which it is his duty to disclose,[20] he is guilty of actual fraud. *Lawson v. Citizens & Southern National Bank of South Carolina*, 259 S.C. 477, 193 S.E.2d 124, 126 (1972). With regard to a representation that is actually false, knowledge of the falsity is legally inferable where one makes it as of his personal knowledge, realizing that he is without information as to its truth, and recklessly disregarding that lack of information. *South v. Sherwood Chevrolet, Inc.*, 277 S.C. 372, 287 S.E.2d 490, 492 (1982).

■ Here, not only did Envirotech fail to disclose material facts, but it represented to Davis & Floyd engineers who were acting as agents for Aiken that Envirotech had successfully tested the equipment and satisfactorily cleaned it with hydrochloric acid. These false representations went to the core of Envirotech's obligations to Aiken. They were made intentionally so as to induce Aiken, which was unaware of their falsity, to refrain from derailing Envirotech's course of action that resulted ultimately in an unsatisfactory system. Envirotech contends that, even if all of this were true, its actions would not constitute fraud because it was within its legal rights in proceeding with the sludge-to-sludge heat exchanger. *See Byars v. Cherokee County*, 237 S.C. 548, 118 S.E.2d 324, 327 (1961) (where one acts within his legal rights, fraud will not be presumed or inferred). In other words, Envirotech contends that, because the change order was unnecessary, Aiken and Bay–Con were legally obligated to permit Envirotech to continue. *See M.B. Kahn Construction Co.*, 271 S.E.2d at 415 (one cannot recover for a fraudulent misrepresentation which induces him to perform an act he was legally obligated to perform). The contract, however, did permit Aiken and Bay–Con to issue a change order that would have required Envirotech to install a different heat exchanger, albeit at a greater cost to them, and they refrained from doing that. In short, we find no error in the district court's conclusion that Envirotech was liable to Aiken for fraud.

Nevertheless, since we are remanding for reconsideration of compensatory damages, South Carolina law requires that we remand for reconsideration of punitive damages as well:

> Generally, actual damages should not be separated from punitive damages for a retrial on actuals alone. Punitive damages may only be awarded if actuals are recovered; and therefore, retrial only on actual damages may be improper since punitive damages may change depending on the actual damage award. In the interest of justice and fairness to all parties, both actual and punitive damages should be reconsidered together on retrial.

*Reid v. Harbison Development Corp.*, 289 S.C. 319, 345 S.E.2d 492, 493 (1986) (citations omitted).

## VII. TRIAL MISCONDUCT

Envirotech asks that the entire district court's judgment be vacated because the court's opinion adopted almost all of the proposed order submitted *ex parte* jointly by Aiken and Davis & Floyd and because *ex parte* contacts took place between the judge and counsel for Davis & Floyd. Envirotech argues that the district court's final order violates the due process standard announced by the United States Supreme Court in *Anderson v. Bessemer City*, 470 U.S. 564, 571–73, 105 S.Ct. 1504, 1510–11, 84 L.Ed.2d 518 (1985), and urges that the *ex parte* contacts violated both the right to due process of law and the proscriptions of 28 U.S.C.A. § 455(a) (West Supp.1988), which requires a judge to recuse himself

---

20. The duty to disclose exists (1) where it arises from a preexisting definite fiduciary relation between the parties; (2) where one party expressly reposes a trust and confidence in the other with reference to the particular transaction in question, or else from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the particular case is necessarily implied; or (3) where the very contract or transaction itself, in its essential nature is intrinsically fiduciary and necessarily calls for perfect good faith and full disclosure without regard to any particular intention of the parties. *Jacobson v. Yaschik*, 249 S.C. 577, 155 S.E.2d 601, 605 (1967).

"in any proceeding in which his impartiality might reasonably be questioned." We find that the district court, in drafting its final opinion, comported with the *Anderson* standards and that the *ex parte* contacts violated neither the due process clause of the fourteenth amendment nor section 455(a).

## A

■ We first address Envirotech's claim that the court's near-verbatim adoption of Aiken and Davis & Floyd's proposed findings of fact and conclusions of law deprived Envirotech of due process of law. At the conclusion of the trial, the court announced its tentative sentiments that Envirotech had breached its contract and that the company's conduct amounted to fraud. The court then instructed the parties to submit findings of fact and conclusions of law. The court's order, issued almost two years later, tracked most of the language of the proposed order submitted by Aiken and Davis & Floyd. The principal difference came in the court's award of $2,865,-500 in replacement cost damages instead of the proposed amount of $5,389,640.

Our resolution of this issue is governed by the Supreme Court's decision in *Anderson,* which discussed the constitutional implications of court orders that adopt the submissions of parties. 470 U.S. at 571–73, 105 S.Ct. at 1510–11. In approving an order tailored strictly to the winning litigant's proposal, the Supreme Court noted several factors that bolstered the integrity of the district court's opinion. First, at the end of the trial, the court issued a preliminary memorandum outlining its findings and merely asked the winning plaintiff to fill in the details. Further, the opposing party "was provided and availed itself of the opportunity to respond at length to the proposed findings." *Id.* at 572, 105 S.Ct. at 1511. The Supreme Court also was impressed that the trial court's ultimate findings "var[ied] considerably in organization and content from those submitted by [the prevailing party]." *Id.* at 572–73, 105 S.Ct. at 1511. "Under these circumstances," the Supreme Court concluded, "we see no rea-

son to doubt that the findings issued by the District Court represent[ed] the judge's own considered conclusions." *Id.* at 573, 105 S.Ct. at 1511.

Here, the judge concluded the trial by announcing general impressions of liability, which he qualified three times as subject to change following the anticipated submissions by each party. The various proposed findings and conclusions covered the many complex technical and legal issues stemming from this fifty-two day trial. Pursuant to the court's instructions, the submissions were filed but were not exchanged among the parties for comments or objections.

The procedure employed by the district court, while less than ideal, meets the standard announced in *Anderson.* The judge's reservation of the right to change his mind concerning issues of liability may well have deterred Aiken and Davis & Floyd from overreaching in their proposed order. In any event, the proposed order accepted by the court was replete with references to the record. Envirotech was able to present its views fully to the court in its proposed order. That the district court independently weighed the proposal is evidenced by the damage award, which was approximately half of that proposed by Aiken. In view of all these circumstances, we think that the order of the district court represents "the judge's own considered conclusions" as required by *Anderson,* 470 U.S. at 573, 105 S.Ct. at 1511.

## B

■ Envirotech challenges the *ex parte* contacts on two grounds, due process of law and section 455(a)'s requirement of a judge's recusal where "his impartiality might reasonably be questioned." We address first the claim that these contacts deprived Envirotech of due process of law.

In August of 1986, fifteen months after the parties submitted proposed findings to the court, trial counsel for Davis & Floyd communicated *ex parte* with the judge concerning a scheduling conflict with regard to a September meeting planned between the judge and Davis & Floyd lawyers regard-

ing the Aiken case. Whether the meeting ever occurred and what may have been discussed is undisclosed.

In October of 1986, another *ex parte* contact occurred between the judge and Davis & Floyd's counsel. Through his law clerk, the judge requested a memorandum concerning the $1,850 judgment for discovery costs entered against Envirotech during the course of the trial. Aiken and Davis & Floyd had not addressed this issue quantitatively in their proposed findings of fact submitted to the court. Envirotech had previously moved to stay enforcement of the judgment for discovery costs pending a final judgment in the case. The two-page memorandum received by the judge recommended that the court reaffirm the discovery judgment and that the court order that the discovery costs judgment be incorporated into the final judgment. The court's final order, issued in November of 1986, included a paragraph expressly reaffirming its judgment against Envirotech for discovery costs and incorporating that judgment into the final order.

The judge received a second memorandum *ex parte* from Davis & Floyd's counsel. Pursuant to that counsel's conversation with the judge's law clerk, the judge received a copy of a pleading of the lawyer's firm in another case. This contained a brief discussion of South Carolina law on awarding prejudgment interest. The Aiken and Davis & Floyd proposed order had not sought prejudgment interest. The court's final order neither mentioned nor included prejudgment interest.

The due process clause protects not only against express judicial improprieties but also against conduct that threatens the "appearance of justice." *Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813, 825, 106 S.Ct. 1580, 1587, 89 L.Ed.2d 823 (1986). The due process clause, therefore, "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties." *Id.* (quoting *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955)).

The appearance of justice, of course, is acutely threatened when a judge has a personal interest in the outcome of litigation. *See, e.g., Id.* 475 U.S. at 817, 106 S.Ct. at 1583 (state supreme court justice casting decisive vote stood to benefit from vote because he was a party in a legally similar case); *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (judicial officer paid according to outcome of cases). Bias or prejudice on the part of a judge also can be sufficiently pervasive as to implicate due process concerns. Allegations of bias or prejudice, however, involve difficult subjective determinations and "only in the most extreme of cases would disqualification on this basis be constitutionally required." *Aetna Life Insurance Co.*, 475 U.S. at 821, 106 S.Ct. at 1585. *Ex parte* contacts do not fit into either the category of personal interest or of bias, but we have no doubt that such conduct in some circumstances can be so egregious as to deny a litigant a fair trial.

We do not think, however, that the two memoranda received by the judge and the ancillary *ex parte* contacts in this case approach the magnitude of constitutional error. Prejudgment interest was only possible if Envirotech had prevailed on its theory that Aiken at most was entitled to liquidated damages amounting to $50,000. The status of the $1,850 judgment for discovery costs was a minor procedural issue in this multi-million dollar lawsuit. Envirotech raised neither of these issues in its proposed order. While not condoning these *ex parte* contacts, we do not believe they denied Envirotech a fair trial.

Our conclusion that Envirotech received a trial consistent with due process does not, however, end the inquiry. "The Due Process Clause demarks only the outer boundaries of judicial disqualification. Congress and the states, of course, remain free to impose more rigorous standards for judicial disqualification...." *Aetna Life Insurance Co.*, 475 U.S. at 828, 106 S.Ct. at 1589. Section 455(a) contains a statement of such a standard: "Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his im-

partiality might reasonably be questioned." 28 U.S.C.A. § 455(a) (West Supp.1988).

We have previously explained the scope of the inquiry required under section 455(a): "The question is not whether the judge is impartial in fact. It is simply whether another, not knowing whether or not the judge is actually impartial, might reasonably question his impartiality on the basis of all the circumstances." *Rice v. McKenzie*, 581 F.2d 1114, 1116 (4th Cir. 1978); *see also Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. ——, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988). Although emphasizing our disapproval of *ex parte* contacts of the type undertaken here, we conclude, following *Rice*, that an objective view of all the circumstances [21] could not reasonably lead to the belief that the judge was not impartial. The topics on which the judge sought assistance involved technical aspects of the final judgment, rather than substantive issues litigated at trial. *Cf. In re Wisconsin Steel Co.*, 48 B.R. 753 (N.D.Ill.1985) (bankruptcy judge's impartiality reasonably questioned where he contacted party's counsel *ex parte* and requested that counsel draft an entire opinion, which he used without alteration). Weighed against these minor contacts is a vast record compiled during fifty-two days of trial that thoroughly demonstrates a daily commitment to assure Envirotech and the other litigants a fair trial. A review of the entire record leaves us with the definite impression that, except for these unexplained departures from normal judicial proceedings, the judge acted diligently and impartially and was fair in conducting the entire trial.

## VIII. ATTORNEYS' FEES AND EXPENSES

■ The district court award of attorneys' fees and litigation expenses to Bay–Con against Envirotech was grounded on the contract between them, which provided that "[i]n the event of litigation ... the prevailing party shall be entitled to recover its legal fees and expenses from the other party." We agree with the district court that Bay–Con is entitled to this award. Bay–Con won full indemnification from Envirotech, so it was the prevailing party.

■ The district court also awarded Davis & Floyd attorneys' fees, justifying its action on the rationale of *Campus Sweater & Sportswear Co. v. M.B. Kahn Construction Co.*, 515 F.Supp. 64 (D.S.C. 1979), *aff'd*, 644 F.2d 877 (4th Cir.1981). In making this award, the court erred. Davis & Floyd was impleaded by Envirotech. Unlike Bay–Con, however, Davis & Floyd did not file a claim against Aiken. Aiken did not name Davis & Floyd as a principal defendant, and we have held that the district court's *sua sponte* effort to consider Davis & Floyd a principal defendant is void. Davis & Floyd, therefore, was not in a dispute with a third party as required by *Campus Sweater & Sportswear Co.* Davis & Floyd has neither a contractual nor implied right to attorneys' fees against Envirotech, and that part of the judgment awarding attorneys' fees and expenses to Davis & Floyd is reversed.

## IX. CONCLUSION

In view of the above, the judgment of the district court:

(a) absolving Davis & Floyd of liability to Aiken is reversed and that part of the judgment is vacated;

(b) finding Envirotech and its surety, INA, liable to Aiken for furnishing and installing the faulty heat treatment unit is affirmed;

(c) finding Bay–Con and its surety, Travelers, liable to Aiken is affirmed;

(d) finding Envirotech liable for fraud is affirmed;

(e) finding the amount of compensatory damages is reversed and remanded for a new trial on the issue of damages only;

(f) finding the amount of punitive damages is reversed and remanded to be rede-

---

**21.** *See In re Federal Skywalk Cases*, 680 F.2d 1175, 1184 (8th Cir.) (recusal under § 455(a) "must be evaluated in light of the full record, not simply in light of an isolated incident"), *cert. denied*, 459 U.S. 988, 103 S.Ct. 342, 74 L.Ed.2d 383 (1982).

termined after the court has fixed compensatory damages;

(g) awarding Bay–Con attorneys' fees is affirmed;

(h) awarding Davis & Floyd attorneys' fees is reversed and that part of the judgment vacated;

(i) holding Envirotech and its surety, INA, liable to indemnify Bay–Con for its liability to Aiken (uncontested here) is affirmed.

MURNAGHAN, Circuit Judge, concurring in part and dissenting in part:

I concur in all but one minor aspect of the majority's comprehensive and meticulously written opinion. I write separately to express my concern for Judge Blatt to whom we remand for consideration of several issues. He most undoubtedly will be subjected to the same disturbing criticism which the defendant Envirotech raised on appeal as to whether he handled the original trial judiciously. I would direct that another district court judge be appointed to hear the case on remand to spare Judge Blatt.

Envirotech protests several actions taken by Judge Blatt which it claims overwhelmingly demonstrated his partiality to Aiken County and Davis & Floyd, the local parties in a diversity case and also the prevailing parties. Foremost, Enrivotech complains that the district court *sua sponte* sought to entertain a direct claim between Aiken County and Davis & Floyd, both nondiverse South Carolina citizens. By its own motion, the district court amended the pleadings to conform to the evidence pursuant to Fed.R.Civ.P. 15(b) and entered a ruling adding Davis & Floyd as a party defendant, thus, insuring it the protection of a favorable judgment (against Envirotech). Although the ruling was initially welcomed, and indeed requested,[1] by Aiken County and Davis & Floyd, as irony would have it, it effectively destroyed diversity jurisdiction over the entire case and, thus, threatened their favorable judgments. Finding that Judge Blatt abused his discretion in amending the complaint to add Davis & Floyd as a party and in awarding Davis & Floyd attorneys fees, the majority has vacated those rulings, and perfected diversity once again.

Envirotech further complains that Judge Blatt and his law clerk communicated *ex parte* with the prevailing parties on two separate occasions [2] and that the district court adopted the bulk of a draft submitted jointly *ex parte* by Aiken County and Davis & Floyd as its opinion. The majority reviewed those contentions by Envirotech and found no judicial misconduct. As the majority concluded, "[a] review of the entire record leaves us with the definite impression that, except for these unexplained departures from normal judicial proceedings, the judge acted diligently and impartially and was fair in conducting the entire trial."

Of course, I do not believe that Judge Blatt's ability as a district court judge is

---

1. Aiken County and Davis & Floyd had a "secret letter agreement" which indicated that they intended to litigate the breach of contract claim between them from the start. In the letter, counsel for Aiken County and Davis & Floyd appeared not only to agree that "the pleadings [were] sufficient to include all claims between Aiken County and Davis & Floyd" but that they would "ask the Court to make findings as to any issue of liability or damage which exists between Aiken County and Davis & Floyd under all facts presented." Letter of March 30, 1982 from Harper to Porter. That agreement appeared in the pretrial memorandum before the district court and was referred to in open court.

2. The first contact involved a letter from counsel for Davis & Floyd to Judge Blatt's law clerk which enclosed two memoranda which Judge Blatt had requested: one on whether the final judgment in the case could include a judgment against Envirotech for discovery costs incurred by Davis & Floyd, and the other from an unrelated case including a section on prejudgment interest. Other parties, Envirotech in particular, were not notified of the contacts or provided copies of the papers. Both issues were resolved by the court against Envirotech and in favor of Davis & Floyd.

The second alleged contact involved a meeting which apparently took place between counsel for Davis & Floyd and Judge Blatt, without notifying other counsel. The meeting was referenced in a letter from counsel for Davis & Floyd to Judge Blatt.

impaired nor do I question his overall management of the case. However, these "unexplained departures from normal judicial proceedings," may raise a doubt in the court observer's mind whether a fair trial was had by all parties. In the interest of a sound judicial system perceived by the lay person as operating evenhandedly, I think that it would be more appropriate to appoint another district court judge to hear the damages issues on remand. Otherwise, Judge Blatt is placed in an unfortunate position which potentially exposes him to the reiteration of not unreasonable sounding grievances that Envirotech asserts have led to denial to it of due process.

Therefore, while I concur in the majority's opinion in all substantive respects, I dissent on the procedural matter as to who should hear the case on remand.