PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

BILLIE J. CHERRY,
          *Defendant-Appellant.*

No. 02-4306

Appeal from the United States District Court
for the Southern District of West Virginia, at Bluefield.
David A. Faber, Chief District Judge.
(CR-01-92)

Argued: February 28, 2003

Decided: May 30, 2003

Before MICHAEL, TRAXLER, and KING, Circuit Judges.

Affirmed in part and vacated in part by published opinion. Judge King
wrote the opinion, in which Judge Michael and Judge Traxler joined.

## COUNSEL

**ARGUED:** Nathan A. Hicks, Jr., Charleston, West Virginia, for
Appellant. Susan Marie Arnold, Assistant United States Attorney,
Charleston, West Virginia, for Appellee. **ON BRIEF:** Kasey Warner,
United States Attorney, Charleston, West Virginia; John A.
Michelich, Senior Trial Attorney, Fraud Section, Criminal Division,
UNITED STATES DEPARTMENT OF JUSTICE, Washington,
D.C., for Appellee.

**OPINION**

KING, Circuit Judge:

On October 12, 2001, a jury in Parkersburg, West Virginia, convicted Billie J. Cherry of multiple counts of conspiracy, bank embezzlement, mail fraud, and money laundering. The jury also determined that Cherry should be ordered to forfeit property derived from, involved in, or traceable to her criminal activities. The court entered judgment on the jury verdict, but it later vacated Cherry's convictions for bank embezzlement because the indictment had failed to allege an essential element of that offense. *United States v. Cherry*, No. 1:01-CR-92, Order (S.D. W. Va. Feb. 1, 2002) (the "Order"). Cherry has appealed her money laundering convictions and the judgment of forfeiture. As explained below, we affirm Cherry's convictions for money laundering, but we vacate the judgment of forfeiture to the extent that it is premised on the vacated embezzlement convictions.

I.

A.

The First National Bank of Keystone (the "Bank") operated for many years in the southern West Virginia mining community of Keystone. In 1977, J. Knox McConnell purchased a substantial interest in the Bank and began to operate it. At that time, the Bank held approximately $17 million in assets, and it served as the area's community bank. In the early 1990s, the Bank began a profitable business of purchasing loans from other loan originators, bundling similar loans together, and reselling the bundled loans as securities. By the mid-1990s, the Bank had acquired a reputation as one of the most profitable community banks in the country, with assets reportedly in the realm of $1 billion.

Rumors of the Bank's financial success were, however, greatly exaggerated. In truth, Bank employees had doctored the Bank's books to create a false appearance of profitability. In late 1999, following an onsite examination, the Office of the Comptroller of the Currency (the "OCC") — the federal agency that regulates national banking prac-

tices — declared the Bank insolvent and appointed the Federal Deposit Insurance Corporation (the "FDIC") as the Bank's receiver. When bank examiners were subsequently unable to verify more than $515 million of loans — reflected as assets on the Bank's books — the Bank was closed.

Thereafter, the federal authorities in southern West Virginia commenced an extensive investigation of the Bank's failure. That investigation culminated in the prosecution of several of the Bank's officers and employees for criminal activities in the Bank's operations. These activities included bank fraud, money laundering, obstruction of justice, and tax and securities offenses. The investigation also led to the indictment of Billie J. Cherry and her co-defendant, Terry L. Church, for their activities in looting the estate of J. Knox McConnell.

B.

From 1977 until his death in 1997, J. Knox McConnell served as the President of the Bank and as an active member of its Board of Directors. At the time of his death, McConnell owned significant assets, including: (1) four savings accounts at the Bank containing the aggregate sum of $4,282,588; (2) 146,619 shares of stock in the Bank, valued at approximately $109 per share; (3) two condominiums, one in Pittsburgh, Pennsylvania, and the other in Orlando, Florida; and (4) a business known as Marbil, Inc., which held a $1.8 million certificate of deposit at the First State Bank and Trust of Rainelle ("First State").[1]

---

[1]In seeking restitution from Cherry, the FDIC suggested that McConnell had, in fact, orchestrated the criminal activity at the Bank. For example, the FDIC insisted that:

> Church, Cherry, J. Knox McConnell ("McConnell"), and Michael H. Graham ("Graham") participated in a broad conspiracy to defraud [the Bank] through various criminal acts including embezzlement, a "due diligence" fee scheme, and a securitization scheme, that ultimately resulted in the failure of [the Bank], resulting in a loss to the FDIC of approximately $500 million.

J.A. 284. The FDIC asserted that, because McConnell's assets were criminally obtained, it (i.e. the FDIC) was entitled to priority in obtaining restitution for its losses, over and above the beneficiaries of McConnell's estate.

Cherry was McConnell's longtime companion, having maintained a close relationship with him since 1957. In 1977, Cherry moved from Pennsylvania to Keystone (located in West Virginia's McDowell County), and she thereafter held numerous positions with the Bank, including Cashier, Controller, and Executive Vice-President. Cherry's co-defendant, Terry L. Church, met McConnell through Cherry in 1975. Like Cherry, Church moved to Keystone in 1977 and began working at the Bank. Church worked her way through the Bank's chain of authority and ultimately became its Senior Executive Vice-President and its Chief Operations Officer. She also served as a member of the Bank's Board of Directors.

McConnell unexpectedly passed away on Sunday, October 26, 1997. In the ensuing days, Church directed Bank employees to secure McConnell's safe deposit boxes, to search bank records in order to identify all of his accounts, and to obtain his savings account passbooks and signature cards. In a flurry of fraudulent activity, Cherry and other Bank employees added Cherry's name to McConnell's accounts, creating joint ownership of the funds held in those accounts. Cherry then closed those accounts and transferred the funds into three newly created accounts owned exclusively by her. After the new accounts were opened, Cherry made no other deposits into them, but she frequently withdrew large sums of money.[2]

In the course of these events, Cherry and Church also executed a fraudulent codicil to McConnell's will (the "fake codicil"). McConnell's will, at the time of his death, devised the majority of his estate

---

[2]These large withdrawals formed the basis of Cherry's money laundering convictions under 18 U.S.C. § 1957. For example, in the counts of the indictment relevant to the judgment of forfeiture: Count Eighteen alleged that, on November 18, 1997, Cherry withdrew $100,000 from one of the newly created accounts and transferred it to another of her accounts. The indictment alleged that she used this money to purchase a 1956 Thunderbird. Count Twenty-Four alleged that, on April 22, 1998, Cherry withdrew $67,000 from one of the accounts to purchase a Cashier's Check, payable to the Estate of J. Knox McConnell for the purchase of the Pittsburgh condominium. Count Twenty-Five alleged that, on April 22, 1998, Cherry withdrew $117,000 from one of the accounts to purchase the Orlando condominium.

to Waynesburg College, located in Waynesburg, Pennsylvania. In order to thwart discovery of the ongoing fraud at the Bank, Cherry and Church decided to alter McConnell's will to prevent Waynesburg College from obtaining control of McConnell's stock in the Bank. Thus, the day after McConnell's funeral, Cherry, Church, and other Bank employees met in Church's office at the Bank, where Church proceeded to draft the fake codicil. Church forged McConnell's signature on the document, which was backdated to May 7, 1996, a date specifically selected because McConnell and the witnesses to the fake codicil had been present in the Bank that day. Another Bank employee notarized the fake codicil, which purported to change McConnell's will and bequeath part of his stock in the Bank to Cherry and Church.

Shortly after the creation of the fake codicil, Cherry advised Church that she also wanted McConnell's condominiums. In an attempt to give Cherry ownership of these properties, Church created a second fraudulent codicil entitled "Disposition of Properties Owned" (the "condominium document"), which provided that McConnell was leaving the condominiums to Cherry. In order to create the appearance that the condominium document had been properly executed, a Bank employee signed as a witness, and Church forged McConnell's signature. Church and Cherry failed, however, to have this document notarized. The condominium document was backdated to August 16, 1996, Cherry's birthday.

On November 17, 1997, Cherry, Church, and other Bank employees offered three writings for probate — McConnell's will, the fake codicil, and the condominium document — delivering them to the Clerk of the County Commission of Mercer County in Princeton, West Virginia. Because the condominium document had not been notarized, the Clerk declined to probate it, and it was returned to Church. McConnell's will and the fake codicil were probated in Mercer County, and Church was appointed by the County Commission to serve as executrix of McConnell's estate. Although the notarization problem precluded Cherry from inheriting the two condominiums under McConnell's will, she later purchased them from his estate for $184,000, using monies she had taken from McConnell's savings accounts at the Bank.

Cherry and Church also obtained $1.8 million from the certificate of deposit (the "CD") owned by Marbil, Inc., a company wholly owned by McConnell. Within two weeks of McConnell's death, Cherry and Church attempted to have First State redeem the CD and transfer the resulting funds to an account at the Bank, but First State refused to do so without the proper corporate resolutions.[3] Thus, Cherry and Church created false corporate records making themselves members of Marbil's Board and giving themselves an ownership interest in the company. Cherry then wrote to First State, representing herself to be President of Marbil and directing First State to redeem the CD and transfer the resulting funds to Marbil's account at the Bank. On December 29, 1997, First State issued a cashier's check, payable to Marbil, Inc., in the sum of $1,838,650.89, which was deposited in Marbil's account at the Bank. The account name was then altered to give Church control of those funds.

## C.

On March 21, 2001, Cherry and Church (collectively, the "defendants") were charged in a twenty-five count indictment returned by a grand jury in the Southern District of West Virginia. Count One charged the defendants with conspiracy to commit bank embezzlement and mail fraud, in violation of 18 U.S.C. § 371. Counts Two through Five charged them with four separate acts of bank embezzlement, in contravention of 18 U.S.C. § 656 (the "Bank Embezzlement Counts"). Counts Six through Nine charged them with mail fraud, in violation of 18 U.S.C. § 1341. Counts Ten through Twenty-Five charged Cherry with money laundering, in contravention of 18 U.S.C. § 1957 (the "Money Laundering Counts").

On September 28, 2001, Cherry filed a motion seeking the disqualification of the presiding judge. The disqualification motion, filed pursuant to 28 U.S.C. § 455(a), was based solely on a letter the judge had written to McConnell in 1991. In that letter, the judge had expressed gratitude for support that McConnell had provided to the

---

[3]Cherry and Church also learned that the CD would not mature until December 29, 1997, and that an early withdrawal would result in a loss of more than $70,000. They therefore decided to wait until the maturity date to move the CD's funds.

judge's nomination and appointment to the federal bench. Cherry maintained that the letter evinced a relationship between the judge and McConnell that would interfere with her right to a fair and impartial trial. On October 1, 2001, the district judge denied the motion, declining to recuse himself from Cherry's trial. *United States v. Cherry*, No. 1:01-CR-92, Opinion and Order (S.D. W. Va. Oct. 1, 2002).

The next day, the defendants' trial commenced in Parkersburg, West Virginia.[4] Following the close of the government's evidence (and again upon the close of all the evidence), the defendants sought a judgment of acquittal on each of the Bank Embezzlement Counts, pursuant to Rule 29 of the Federal Rules of Criminal Procedure.[5] In these motions, the defendants maintained that the indictment did not properly charge bank embezzlement because the Bank Embezzlement Counts failed to allege an essential element of the offense. Pursuant to Rule 29(b),[6] the trial court reserved ruling on the judgment of acquittal issue, and the case was submitted to the jury.

On October 12, 2001, the jury returned a guilty verdict against the defendants on all the substantive offenses. After the jury returned this

---

[4]The indictment was returned by a grand jury in the court's Charleston Division, and the case was initially docketed in its Bluefield Division. Because of publicity surrounding the Bank's failure, Cherry filed a motion, pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure, requesting that her trial be moved out of the Southern District of West Virginia. While the court denied this motion, it ordered that the case be tried in Parkersburg, which is about 175 miles from Bluefield. *United States v. Cherry*, No. 1:01-CR-92, Order (S.D. W. Va. Aug. 31, 2001).

[5]Rule 29(a) provides: "After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).

[6]Pursuant to Rule 29(b): "The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict." Fed. R. Crim. P. 29(b).

verdict, the court directed it to consider the forfeiture issues. Under the court's forfeiture instructions, the jury assessed whether the government had proven, by a preponderance of the evidence, that the property sought to be forfeited was derived from, involved in, or traceable to the defendants' criminal activities.[7] In a special verdict, the jury determined that Cherry and Church should be ordered to forfeit the sum of $4,282,588 on the bank embezzlement offenses, and that Cherry should be ordered to forfeit a 1956 Ford Thunderbird, as well as the Pittsburgh and Orlando condominiums, on the basis of the money laundering convictions. On October 15, 2001, the court entered judgment against Cherry and Church.

Thereafter, the defendants filed motions challenging their convictions and the judgment of forfeiture. Of particular relevance to this appeal, they renewed their motions for judgment of acquittal, maintaining that the Bank Embezzlement Counts were fatally flawed.[8] On February 1, 2002, the court entered its Order arresting judgment on the Bank Embezzlement Counts, on the ground that they failed to allege a judicially created element of that offense, specifically, that the defendants had acted with the intent "to injure or defraud the bank." Order at 7 (quoting *United States v. Caldwell*, 544 F.2d 691, 696 (4th Cir. 1976)).[9]

On April 5, 2002, Cherry was sentenced to a term of imprisonment of 197 months, consisting of consecutive sentences of fifty-three months on Count One, twelve months each on Counts Six through Nine, and six months each on Counts Ten through Twenty-Five. Cherry was also sentenced to a three-year term of supervised release, and she was ordered to make restitution (jointly with Church) in the

---

[7]In instructing the jury on the standard of proof for the forfeiture determination, the court rejected Cherry's proposed instruction, which would have required the jury to apply a reasonable doubt standard.

[8]Church also filed a post-trial motion, under Rule 34 of the Federal Rules of Criminal Procedure, seeking to arrest judgment on the Bank Embezzlement Counts. The motion for arrest of judgment reiterated the contentions made in the renewed motion for judgment of acquittal.

[9]The government has not appealed the Order vacating the bank embezzlement convictions.

sum of $6,121,238.89.[10] After the court entered final judgment, Cherry filed a timely notice of appeal.[11] We possess jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

In her appeal, Cherry raises multiple issues. First, she insists that the presiding judge erred in failing to recuse himself from her trial. Second, she contends that her money laundering convictions should be vacated because the district court vacated the predicate offenses of bank embezzlement. Finally, she challenges the judgment of forfeiture, contending: (1) that the court erred in its instructions to the jury regarding the standard of proof under 18 U.S.C. § 982; and (2) that she should not be required to forfeit property related to the vacated bank embezzlement convictions.[12] We address each of these contentions in turn.

## II.

We review a trial judge's decision on matters of recusal for abuse of discretion. *United States v. Cole*, 293 F.3d 153, 164 (4th Cir.), *cert.*

---

[10]The restitution figure of $6,121,238.89 includes the sum of $4,282,588 embezzled from McConnell's accounts, as well the sum of $1,838,650.89 that Cherry, together with Church, fraudulently obtained from the Marbil CD.

[11]Church initially also sought to appeal, but she later filed an unopposed motion to dismiss her appeal, which we granted on July 12, 2002. *See United States v. Church*, No. 02-4324, Order (4th Cir. July 12, 2002).

[12]While Cherry has challenged the judgment of forfeiture, she has not contested the restitution aspect of her sentence. We note that there are competing claims for restitution. The FDIC has made a claim on Cherry's assets, insisting that it — in its capacity as receiver for the Bank — was the sole victim of Cherry's criminal activities. Waynesburg College, as the primary beneficiary of McConnell's estate, has also made a claim for restitution. Acknowledging these competing claims, the court, in entering its judgment, ordered that the "[r]estitution payments, along with assets liquidated for restitution purposes, . . . be paid into the registry of the court and held until the court can determine an appropriate disbursement amount for the victims, pending further developments in civil litigation." *United States v. Cherry*, 1:01-CR-92, Judgment in a Criminal Case, at 10 (S.D. W. Va. April 5, 2002).

*denied*, 123 S. Ct. 387 (2002). By contrast, we apply a plain error standard of review to issues not previously raised in the district court, such as Cherry's challenges to her money laundering convictions. *See* Fed. R. Crim. P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). Finally, "[w]e review de novo the claim that jury instructions fail to correctly state the law." *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 235 (4th Cir. 2000).

III.

A.

On appeal, Cherry first asserts that the district court erred in denying her recusal motion. She bases this contention on the guiding principle that due process requires a trial judge to be neutral. As Cherry suggests, a judge must possess neither actual nor apparent bias against a party, and "in the most extreme of cases" of bias, where, for example, a judge has a personal stake in the outcome of litigation, the judge's recusal will be required. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821 (1986); *see also Aiken County v. BSP Div. of Envirotech Corp.*, 866 F.2d 661, 678 (4th Cir. 1989) ("The due process clause protects not only against express judicial improprieties but also against conduct that threatens the 'appearance of justice.'" (quoting *Aetna Life Ins. Co.*, 475 U.S. at 825)). If a judge possesses actual or apparent prejudice either for or against a party, federal law provides the aggrieved party with a statutory remedy. *See, e.g.*, 28 U.S.C. § 455.

A federal judge is obliged to recuse himself if a person with knowledge of the relevant facts might reasonably question his impartiality. 28 U.S.C. § 455(a). The test is an objective one: as we have previously observed, a judge must disqualify himself whenever his "'impartiality might reasonably be questioned.'" *In re Beard*, 811 F.2d 818, 827 (4th Cir. 1987) (quoting 28 U.S.C. § 455(a)). In other words, "[d]isqualification is required if a reasonable factual basis exists for doubting the judge's impartiality. The inquiry is whether a reasonable person would have a reasonable basis for questioning the judge's impartiality, not whether the judge is in fact impartial." *In re Beard*, 811 F.2d at 827 (citation omitted). A presiding judge is not, however,

required to recuse himself simply because of "unsupported, irrational or highly tenuous speculation." *United States v. DeTemple*, 162 F.3d 279, 287 (4th Cir. 1998) (internal quotation marks omitted). Put simply, "[t]he proper test to be applied is whether another with knowledge of all of the circumstances might reasonably question the judge's impartiality." *Beard*, 811 F.2d at 827.

In other circumstances, we have held that a presiding judge need not recuse himself simply because he possesses some tangential relationship to the proceedings. For example, in *Beard*, we decided that a bankruptcy judge was not required to disqualify himself because of statements he made during the course of Chapter 11 proceedings in his court. In those proceedings, the judge had indicated that he thought the president of the debtor corporation was a "fine man." *Id.* at 828. Similarly, in *DeTemple*, we held that a presiding judge was not required to recuse himself from a criminal prosecution arising out of bankruptcy fraud, even though the judge had previously represented victims of the fraud. 162 F.3d at 287-88. By the same token, in *Cole*, we affirmed the decision of a district judge to preside over a trial even though the judge had a personal relationship with a government witness. 293 F.3d at 164. The witness was the son of the judge's deceased godparents, but the judge had not had contact with the witness in over ten years. We decided that, because this relationship had become attenuated, a reasonable observer would not question the judge's impartiality. *Id.*

Applying these principles here, we are unable to conclude that the presiding judge abused his discretion in declining to recuse himself.[13] The judge had less than a dozen personal contacts with McConnell during the course of McConnell's life. The 1991 letter, which formed the sole basis for Cherry's recusal motion, represents no more than a

---

[13]Contrary to Cherry's contention, the court was not required to conduct an evidentiary hearing on the recusal issue. Indeed, § 455(a) does not specify any particular procedures that a judge should employ in deciding a recusal motion. A judge may, of course, in his discretion, conduct an evidentiary hearing or transfer a recusal request to another judge for determination. *See, e.g.*, *United States v. Heldt*, 668 F.2d 1238, 1271-72 (D.C. Cir. 1981). But the failure to conduct such a hearing does not, in these circumstances, entitle Cherry to a new trial.

perfunctory letter of appreciation.[14] It is common and perfectly appropriate for citizens to lend support to judicial nominees, and it is also proper for nominees to acknowledge such support with letters of appreciation. As we have previously acknowledged, "the more common a potentially biasing circumstance and the less easily avoidable it seems, the less that circumstance will appear to a knowledgeable observer as a sign of partiality." *DeTemple*, 162 F.3d at 287 (internal quotation marks omitted). Furthermore, even if the judge had maintained a close friendship with McConnell, McConnell has only a tangential relationship to this case. Cherry's criminal activities victimized the beneficiary of McConnell's estate, Waynesburg College, rather than McConnell himself. In these circumstances, we are unable to say that a reasonable observer would question the presiding judge's impartiality. The judge was thus within his discretion in declining to recuse himself.

B.

Cherry also maintains on appeal that her money laundering convictions should be vacated because the district court has vacated her four bank embezzlement convictions. Put differently, Cherry contends that her money laundering convictions necessarily depend on her bank embezzlement convictions because bank embezzlement is alleged to be the specified unlawful activity in the Money Laundering Counts. Although Cherry has simply raised a general challenge to her money laundering convictions, we address three more specific arguments she seems to be making: (1) the evidence was insufficient to support her money laundering convictions; (2) the indictment did not validly charge her with money laundering; and (3) the jury was not properly instructed as to the elements of money laundering. We discuss each of these issues separately.

---

[14]McConnell apparently claimed to have influence in the nation's capital, as the letter states: "It was great joining you for dinner in Bluefield on Monday. . . . I also want to thank you for copying me in on all of your recent correspondence with officials at the White House and Department of Justice. Your continued support is a source of great comfort and inspiration."

## 1.

We must first determine whether the government presented sufficient evidence to convict Cherry of money laundering, even though she was not convicted of the specified unlawful activity of bank embezzlement. Money laundering, under § 1957, is defined as "knowingly [engaging] in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a).[15] It is clear that a defendant may be convicted of money laundering even if she is not a party to, much less convicted of, the specified unlawful activity. *United States v. Smith*, 46 F.3d 1223, 1234 (1st Cir. 1995) ("There is no requirement that the defendant must have committed the crime . . . from which the property was derived." (internal quotation marks omitted)); *see also United States v. Richard*, 234 F.3d 763, 768-69 (1st Cir. 2000) (upholding money laundering convictions even though defendant had been acquitted of specified unlawful activity); *United States v. Mankarious*, 151 F.3d 694, 703 (7th Cir. 1998) (upholding convictions for money laundering even though court dismissed counts alleging specified unlawful activity); *United States v. Kennedy*, 64 F.3d 1465, 1479-80 (10th Cir. 1995) (affirming money laundering convictions despite acquittal of specified unlawful activity). Pursuant to this principle, it was not essential to Cherry's money laundering convictions that she also be convicted of bank embezzlement.

## 2.

Second, we assess whether the indictment sufficiently charged Cherry with money laundering, even though the four Bank Embezzlement Counts were fatally flawed. Each of the Money Laundering Counts in the indictment alleged that Cherry violated 18 U.S.C. § 1957, in that:

---

[15]Section 1957(f)(1) defines a "monetary transaction" as "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution." 18 U.S.C. § 1957(f)(1). Section 1957(f)(2) defines "criminally derived property" as "any property constituting, or derived from, proceeds obtained from a criminal offense." *Id.* § 1957(f)(2).

> [o]n or about the date indicated below for each Count . . . defendant BILLIE J. CHERRY knowingly engaged in and caused others to engage in a monetary transaction affecting interstate commerce in criminally derived property, that was of a value greater than $10,000, and that was derived from a specified unlawful activity, that is, bank embezzlement, in violation of 18 U.S.C. § 656, by causing the withdrawal and transfer of funds and monetary instrument from defendant BILLIE J. CHERRY'S account.

The Money Laundering Counts further charged that "[w]hile engaging in and causing others to engage in [certain] monetary transactions, defendant BILLIE J. CHERRY knew that the property involved was criminally derived." The indictment, however, nowhere specified the essential elements of bank embezzlement. Because neither the Money Laundering Counts nor the Bank Embezzlement Counts set forth all of the elements of the predicate offense, we must decide whether the indictment nonetheless sufficiently alleged the offense of money laundering.

In *United States v. Smith*, 44 F.3d 1259 (4th Cir. 1995), we addressed the precise question at issue here, namely, whether an indictment charging money laundering must allege all of the elements of the specified unlawful activity. As we observed there, "details about the nature of the unlawful activity underlying the [money laundering] need not be alleged." *Id.* at 1265; *see also United States v. Caldwell*, 302 F.3d 399, 413 (5th Cir. 2002) (finding indictment sufficiently charged defendant with money laundering even though it did not allege elements of specified unlawful activity); *cf. United States v. McGauley*, 279 F.3d 62, 70 (1st Cir. 2002) ("[W]e do not require the indictment to specify the predicate offense underlying a money laundering charge." (internal quotation marks omitted)). Thus, it was not necessary for the Money Laundering Counts to have alleged the elements of the specified unlawful activity (i.e., bank embezzlement). It was sufficient for those counts to have alleged, as they did, that the money laundering transactions involved funds derived from a specified unlawful activity, and that such activity violated 18 U.S.C. § 656. As in *Smith*, "[n]othing more need be alleged." 44 F.3d at 1265.

3.

Third, we assess whether the jury was properly instructed on the elements of money laundering. The offense of money laundering requires "proof beyond a reasonable doubt that the defendant knowingly participated in a monetary transaction involving criminally derived proceeds." *United States v. Najjar*, 300 F.3d 466, 481 (4th Cir.), *cert. denied*, 123 S. Ct. 705 (2002). Here, the jury was properly instructed that, in order to convict Cherry on the Money Laundering Counts, it was required to find that the financial transactions at issue in those counts involved proceeds derived from a specified unlawful activity, that is, bank embezzlement under § 656. Further, the jury was instructed on each element of bank embezzlement, including the element that the indictment had failed to allege, i.e., that Cherry acted "with the intent to injure and defraud the bank" in embezzling funds from McConnell's accounts. Thus, the jury was adequately instructed on the essential elements of money laundering under § 1957.

In these circumstances, there was no error in Cherry's money laundering convictions. Absent error, there can be no "plain error," and each of her convictions must be affirmed.

C.

Finally, Cherry contests the validity of the judgment of forfeiture. With respect to the forfeiture award, Cherry raises two contentions: first, she asserts that the court erroneously instructed the jury on the standard of proof relevant to assessing the forfeiture issues; second, she insists that the judgment of forfeiture must be vacated because the court has vacated her convictions on the Bank Embezzlement Counts. We address each of these contentions in turn.

1.

By the indictment, the grand jury sought the criminal forfeiture of property involved in Cherry's criminal activities at the Bank, pursuant to 18 U.S.C. § 982.[16] Specifically, it sought forfeiture of the aggregate

---

[16]Section 982 provides a *criminal* (in personam) forfeiture remedy against defendants convicted of certain offenses. By contrast, § 981 pro-

sum of $4,282,588; the 1956 Ford Thunderbird; and the Pittsburgh and Orlando condominiums. Prior to the court's submission of the forfeiture issue to the jury, Cherry proposed an instruction that would have required the jury to apply a reasonable doubt standard of proof in deciding whether she should be ordered to forfeit property. The court, however, rejected Cherry's proposal and instead instructed the jury that it should apply a "preponderance of the evidence" standard.[17] On appeal, Cherry contends that the court erred in authorizing criminal forfeiture on the basis of a preponderance standard.[18]

---

vides for *civil* (in rem) forfeiture of property involved in certain offenses. The most notable distinction between civil and criminal forfeiture is that civil forfeiture proceedings are brought against property, not against the property owner; the owner's culpability is irrelevant in deciding whether property should be forfeited. *See United States v. Sandini*, 816 F.2d 869, 872 (3d Cir. 1987) ("Civil forfeiture is an in rem proceeding. The property is the defendant in the case, and the burden of proof rests on the party alleging ownership. The innocence of the owner is irrelevant — it is enough that the property was involved in a violation to which forfeiture attaches."). By contrast, the prime objective of criminal forfeiture is to punish the property owner. *Id.* at 873.

[17]The court's instruction advised the jury, in relevant part, that: "[t]o find that the alleged proceeds and property described in the Indictment are subject to forfeiture, you must be convinced *by a preponderance of the evidence* that the sums charged fairly represent the amounts derived from proceeds that the defendants obtained directly or indirectly from the offenses charged in [the Bank Embezzlement Counts] and that the property charged fairly represents the property which was involved in, or is traceable to property involved in [the Money Laundering Counts]." Cherry's proposed instruction substituted the highlighted language with the phrase "beyond a reasonable doubt."

[18]Cherry bases her contention regarding the standard of proof on the Third Circuit's decision in *United States v. Pellulo*, 14 F.3d 881 (3d Cir. 1994), where the court held that the reasonable doubt standard governs forfeiture determinations under RICO's criminal forfeiture provision, 18 U.S.C. § 1963. While we have not decided the standard of proof applicable to forfeiture determination under § 1963, other circuits have suggested that the preponderance standard may apply. *See United States v. Houlihan*, 92 F.3d 1271, 1299 n.33 (1st Cir. 1996).

In any event, the Third Circuit, in *United States v. Voigt*, 89 F.3d 1050 (3d Cir. 1996), decided that *Pellulo*'s reasoning should not be extended

A judgment of forfeiture, imposed pursuant to 18 U.S.C. § 982, is not a separate conviction; rather, it constitutes part of the sentence, in that it is utilized to enhance the punishment of a defendant who has already been convicted of a particular offense. Section 982(a) provides in part that a court "*in imposing a sentence on a person convicted of an offense* in violation of section . . . 1957 . . . shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C. § 982(a) (emphasis added). Because forfeiture represents a penalty, rather than a separate criminal offense or an element of a criminal offense, the court properly instructed the jury that the preponderance standard governed its findings under § 982. *See United States v. Tanner*, 61 F.3d 231, 234 (4th Cir. 1995) (holding, under different forfeiture statute, that "forfeitures are a penalty" and thus that "the preponderance standard should govern"); *see also Libretti v. United States*, 516 U.S. 29, 42 (1995) (emphasizing that criminal forfeiture is part of sentence).

Two of our sister circuits have previously addressed the appropriate standard of proof in the context of § 982 forfeiture determinations. They have both decided, consistent with the instruction of the district court here, that the preponderance standard applies. In *United States v. Voigt*, 89 F.3d 1050 (3d Cir. 1996), the Third Circuit concluded that forfeiture is a sentencing sanction, rather than a separate offense or an element of an offense. Accordingly, it held "that the preponderance, not the reasonable doubt, standard governs forfeiture under § 982(a)(1)." *Id.* at 1083. Similarly, in *United States v. Myers*, 21 F.3d

---

to forfeitures under 18 U.S.C. § 982, the forfeiture provision at issue here. As that court held, "there are good reasons for employing the reasonable doubt standard in the RICO context but not in the money laundering context." 89 F.3d at 1083. In particular, "[t]he RICO forfeiture provision is by far the most far reaching" forfeiture provision, "sweeping far more broadly" than "the substantive RICO offense itself." *Id.* at 1084. "Accordingly, since the identity and extent of property subject to forfeiture will not have been addressed in the course of proving the substantive RICO charge, a reasonable doubt burden of persuasion ensures greater accuracy in determining the scope of property subject to forfeiture." *Id.* Forfeiture proceedings under § 982, by contrast, are more limited, and relate more closely to the substantive offense of money laundering.

826 (8th Cir. 1994), the Eighth Circuit decided that Congress intended "that forfeiture under the money laundering provision is . . . a sentencing sanction, not an offense or element of an offense. Therefore, the preponderance standard of proof applies to forfeiture under 18 U.S.C. § 982(a)(1)." *Id.* at 829. We agree with our sister circuits that the preponderance standard applies to forfeiture under § 982(a). Accordingly, the district court properly rejected Cherry's proposed instruction.

2.

Cherry also contends that the judgment of forfeiture must be vacated to the extent that it is premised on her now-vacated bank embezzlement convictions. As Cherry observes, a judgment of forfeiture must be based on the conviction of one of a variety of offenses. 18 U.S.C. § 982. The jury returned a special verdict against Cherry on the judgment of forfeiture, which tied the aggregate sum of $4,282,588 to her four bank embezzlement convictions and linked the balance of the forfeited property — the 1956 Ford Thunderbird and the condominiums — to her separate money laundering convictions. Significantly, the government concedes on appeal that it is not entitled to collect the forfeited sum of $4,282,588, and it has not sought to enforce the forfeiture judgment as to these monies. In these circumstances, we agree that the judgment of forfeiture may not include the sum of $4,282,588, which was premised on Cherry's defective and now-vacated bank embezzlement convictions.

IV.

For the foregoing reasons, we affirm Cherry's money laundering convictions, but we vacate the judgment of forfeiture insofar as it is premised on Cherry's now-vacated bank embezzlement convictions.

*AFFIRMED IN PART AND VACATED IN PART*