**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 04-4685**

─────────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

BARBARA MURPHY AGNEW,

Defendant - Appellant.

─────────────

**No. 04-4686**

─────────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

MICHAEL RAYMOND AGNEW,

Defendant - Appellant.

─────────────

Appeals from the United States District Court for the Eastern
District of Virginia, at Norfolk.  Jerome B. Friedman, District
Judge.  (CR-02-109)

─────────────

Argued:  May 27, 2005          Decided:  September 2, 2005

─────────────

Before GREGORY and DUNCAN, Circuit Judges, and HAMILTON, Senior
Circuit Judge.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED:** Aaron Michael Street, BAKER BOTTS, Houston, Texas, for Barbara Murphy Agnew and Michael Raymond Agnew. Stephen Westley Haynie, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for the United States. **ON BRIEF:** Paul F. Enzinna, BAKER BOTTS, Washington, D.C., for Barbara Murphy Agnew and Michael Raymond Agnew. Paul J. McNulty, United States Attorney, Michael J. Elston, Assistant United States Attorney, Norfolk, Virginia, for the United States.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Michael and Barbara Agnew (the "Agnews") appeal their convictions following a bench trial of eleven counts of bank fraud, one count of embezzlement, one count of conspiracy to commit embezzlement, three counts of money laundering and one count of conspiracy to commit laundering. They were each sentenced to twenty-four months' imprisonment, followed by five years of supervised release.[1] The Agnews challenge the district court's denial of their motion for a new trial based upon newly discovered evidence of judicial bias and the denial of their motion for a judgment of acquittal. For the reasons that follow, we affirm.

## I.

The factual underpinnings of this appeal appear largely undisputed. However, since this is an appeal from the denial of a motion for a judgment of acquittal based on insufficiency of the evidence, we recite the evidence in the light most favorable to the government. United States v. Gallimore, 247 F.3d 134, 136 (4th Cir. 2001).

After working for a construction contractor for a number of years, Michael Agnew left to start his own company in 1986. He

---

[1]In their brief, the Agnews argued that the sentences violated their Sixth Amendment rights as set forth in Blakely v. Washington, 124 S. Ct. 2531 (2004). The Agnews subsequently filed an unopposed motion to dismiss their appeal with respect to the sentencing issues, which we granted by order entered April 15, 2005.

created AGM Development Corporation ("AGM"), a Virginia entity located in Virginia Beach. Michael Agnew was the sole stockholder, director and president. Barbara Agnew served as secretary and treasurer. AGM engaged in the business of installing concrete foundations and building concrete structures, usually as a subcontractor under a construction contract awarded to a general contractor.

In the construction industry, subcontractors frequently have to wait a long time for the general contractor to pay their invoices. To meet cash flow needs in the interim, companies like AGM will often transfer their invoices for work performed on behalf of a general contractor to a financial institution. The financial institution will then provide the subcontractor with a loan or line of credit against the accounts receivable, less a fee and a percentage that it holds back as a reserve against the invoices being disputed in whole or in part.

The first financial institution with which the Agnews worked was Reservoir Capital ("Reservoir"), a so-called "factoring" service based in Baltimore, Maryland. Under the factoring agreement, Reservoir selected which invoices it would purchase, against which it charged a fee of approximately 3% and retained a reserve of 20%.

In 1995, Resource Bank ("Resource"), an FDIC-insured institution also located in Virginia Beach, approached AGM about

4

participating in its new Cash Flow Management ("CFM") Program. The Agnews acknowledge that, on paper, the CFM was similar to its agreement with Reservoir. Significantly, it provided that AGM could only submit "valid" invoices that were actually due from a general contractor, for which Resource would pay in full, less a fee and reserve charge.

There were, however, advantages to Resource's proposal. Resource charged lower fees and reserve amounts; it operated as an invisible entity in AGM's financing, whereas Reservoir had frequent contact with AGM's contractors; and, finally, working with a bank entailed greater flexibility in terms of financing. As a result, the Agnews paid a severance fee to terminate the agreement with Reservoir and AGM became a client of Resource through its CFM program in January of 1996.

During the course of AGM's relationship with Resource, Michael Agnew signed several iterations of the CFM agreement. They all, however, contained numerous references to the requirement that the invoices submitted must be "valid," i.e., they must reflect "the terms of a non-cash sale of goods or provisions of services previously made by the Business to a Customer." J.A. 979, 2910.[2]

---

[2]CFM documentation was replete with provisions to the effect that by submitting an invoice AGM was "making a legal representation to the bank that all receivables assigned and sold. . .are valid," that a valid invoice had to be a "bona fide and existing obligation" of AGM customers, and that submitting fraudulent invoices could lead to criminal sanctions. J.A. 981, 1914, 2922.

Despite the unambiguousness of the CFM agreement, however, by September of 1996 AGM had begun to submit invoices for work that had not been performed. In fact, according to Barbara Agnew, AGM submitted several series of invoices for the entirety of large subcontracting jobs over a period of days or weeks, up to the full amount of the contract for which they received payment from Resource, despite the fact that the general contractor did not make good on those invoices until much later. The Agnews explained this course of conduct by claiming it to be their understanding that Resource was willing to advance the full amount of a contract, even though the work remained outstanding and the governing documents specifically proscribed such payment.

Eventually, however, this practice caught up with AGM, as its expenses outpaced the growth of its business and it began to experience financial difficulties. After several shortfalls prompted Resource to charge $3 million to AGM's reserve account, Resource sent an audit letter to one of AGM's general contractors, Ritchie Curbow Construction Company ("RCCC") in June of 1999. The letter requested information regarding invoices reflecting $243,000 in services AGM rendered to RCCC. RCCC replied that it owed AGM nothing, explaining that while it had bid on a project and promised AGM the concrete subcontract, its bid had been rejected. Rather than defaulting AGM on the CFM program, Resource charged this amount to AGM's reserve account.

As AGM's financial condition deteriorated, it appears that the Agnews withheld payments from their employees' 401(k) plans. It was these actions that would form the basis of the embezzlement charges. The evidence reflects that Debbie Lundberg, AGM's office manager, regularly sent employees' 401(k) witholding checks to Putnam Investments ("Putnam") until the summer of 1998. At that point, Barbara Agnew instructed her to cease sending them due to AGM's cash shortage. When Ms. Lundberg subsequently asked about sending a check off, Mrs. Agnew responded, "Just hold on to it until further notice." J.A. 568. In March of 1999, a Putnam representative contacted Ms. Lundberg to inquire about the missing contributions. When she brought the issue to Mrs. Agnew's attention, she responded, "I guess I'll have to deal with it now." J.A. 570-71.

Lundberg's testimony is bolstered by that of a long time friend and work colleague of the Agnews, Dan Des Roches, who realized that he had not been receiving any commissions for the AGM plan. He contacted Mrs. Agnew, who responded that Ms. Lundberg, who had resigned, had perhaps not taken care of it. Mr. Des Roches then suggested that Mrs. Agnew participate in a conference call with Putnam, which she did. Mrs. Agnew reached an agreement with Putnam whereby she agreed to pay for the missed contributions since May 1998, approximately $27,000, and to resume making monthly

7

contributions.  However, she never did resume payments, and failed to return Putnam's calls following up on the agreement.

Also during the period before AGM's closing, one of AGM's project managers, Jack Ellenor, specifically asked Michael Agnew to look into why his 401(k) plan was not being funded.  Mr. Agnew responded that he "would take care of it," although no further contributions were made.  J.A. 550.

AGM's financial condition continued to worsen.  By July of 1999, it became clear that AGM had $3.3 million outstanding on invoices submitted through Resource's CFM program.  Resource attempted to rectify this by extending a line of credit for the roughly  two-thirds of that which represented work to be performed in the future, whereas the remainder was handled through the CFM program.  It later became clear, however, that AGM had also incurred in excess of $1 million in federal and state tax liabilities.  On August 6, 1999, AGM closed its doors when it was unable to meet its payroll.

An FBI agent contacted Resource Bank upon reading about AGM's collapse in the media, and the criminal prosecutions ensued.  The Agnews requested a bench trial, and on July 11, 2003, the district court annnounced its verdicts orally from the bench.  The court found both defendants guilty of eleven counts of bank fraud, one count each of conspiracy to embezzle and of embezzlement, three

8

counts of money laundering and one count of money laundering conspiracy.

The Agnews' Presentence Report ("PSR") provided a guideline loss figure of $3,088,683.95, with a total offense level of 31, which carried a range of 108 to 135 months imprisonment. In sentencing the Agnews, the district court noted, among other things, that the Agnews are "exceptionally devoted to their children" and "play an extremely important role in their children's lives." J.A. 2493. He also noted that their case was "perhaps one of the most benign cases of fraud the Court has ever seen." J.A. 2490. On those and other grounds, on August 13, 2004, the district court concluded that the Agnews were entitled to a significant downward departure, to an offense level of 17, with a sentencing range of 24 to 30 months. He then entered judgment at the lower end of that range, sentencing the Agnews to 24 months imprisonment, and provided that they could serve staggered sentences (overlapping by one year) to minimize the amount of time their children would be without a parent.

The Agnews filed a motion for judgment of acquittal in December of 2003, which the district court denied by order dated February 3, 2004.

In mid-July of 2004, the Agnews learned that the district judge had been involved in a business partnership with A. Russell Kirk and Daniel Hoffler, two individuals adversely affected by

9

their actions.  Kirk was a member of the Board of Directors of Resource Bank and its third largest shareholder.  Daniel Hoffler was President of Armada Hoffler, one of the general contractors for whom AGM regularly performed work.  From 1983 to late 1991 or early 1992, Kirk, Hoffler and the judge (who was then in private practice) were partners in an enterprise established to own and operate an office building.

On September 1, 2004, the Agnews filed a pro se motion for a new trial based on newly discovered evidence pursuant to Federal Rule of Criminal Procedure 33.  The Agnews argued that had they known of the judge's prior relationship with Kirk and Hoffler, they would not have waived their right to a jury trial and submitted to a bench trial.  They therefore sought a new trial on the ground that their waiver was not knowing and voluntary.

The district court entered an order denying the motion on September 3, 2004.  The court concluded that the defendant's motion for a new trial was not based on "newly discovered evidence" within the meaning of Rule 33(b).  The significance of this conclusion is that a motion for a new trial under Rule 33(b) based on newly discovered evidence must be filed within three years after the verdict.  Fed. R. Crim. P. 33(b).  A motion for a new trial based on any other reason "must be filed within seven (7) days after the verdict or finding of guilty."  Id.  Concluding that the motion was not based on newly discovered evidence, the court held that the

10

Agnew's motion for a new trial, which was filed more than a year after they were found guilty, was untimely.

The district judge nevertheless attached an affidavit to the September 3 order, responding to the allegations of bias and affirming that the facts referred to had no bearing on his verdict. He stated that prior to the trial, he had no knowledge of Resource Bank, who owned stock in it or the composition of its Board of Directors. With respect to the business relationship with Kirk and Hoffler, the judge stated that the partners in the law firm with which he was affiliated in the 1980's became involved in a partnership to construct an office building. The original partnership consisted of sixteen members, twelve of whom were partners in the firm, and four of whom were outside "developing partners." Kirk and Hoffler were two of the developing partners. The judge stated that to the best of his knowledge, he had never met Kirk, did not recognize the name, and had no recollection of the partnership or involvement with it after January of 1992.

The Agnews timely appealed the denials of their motions for judgment of acquittal and for a new trial.

## II.

### A.

The Agnews moved for a new trial under Rule 33 based on the fact that their jury trial waiver was made without knowledge of the

trial judge's potential conflict of interest. This motion collapses into a determination of whether the apparent conflict mandated the judge's recusal. "[I]f [the facts suggesting bias] are not sufficiently grave to require disqualification of the judge under 28 U.S.C. § 455 they could not qualify as circumstances requiring the judge's Sua sponte reconfirmation of an earlier waiver." Wyatt v. United States, 591 F.2d 260, 265 (4th Cir. 1979). Accordingly, we review the Rule 33 motion to determine whether the alleged partiality or bias rises to the level requiring recusal. If it does not, then the district judge did not err in denying the Rule 33 motion. We review the district court's decision to deny the Agnew's Rule 33 motion for a new trial based on partiality or bias for an abuse of discretion. United States v. Wilson, 118 F.3d 228, 237 (4th Cir. 1997).

As a threshold matter, the Agnews dispute the district court's conclusion that their motion was not based on newly discovered evidence.[3] Having reviewed the record of this case carefully, we conclude that the information about the district judge's prior relationship with Kirk and Hoffler was "newly discovered" for purposes of Rule 33.[4] The district judge, however, did not abuse

[3]As noted above, under the plain language of Rule 33, the motion would be timely if it were based on newly discovered evidence, but untimely if it were not. Fed. R. Crim. Pro. 33.

[4]We base our conclusion that the judge's prior relationships should be considered "newly discovered evidence" on a careful review of the facts of this case in light of existing analogous

his discretion in denying the motion, because the alleged partiality or bias does not rise to the level requiring recusal.

"Any . . . judge . . . of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455. In determining whether a judge's impartiality might reasonably questioned, we apply an objective test. United States v. Cherry, 330 F.3d 658, 665 (4th Cir. 2003). "'The inquiry is whether a reasonable person would have a reasonable basis for questioning the judge's impartiality, not whether the judge is in fact impartial.'" Id. (quoting In re Beard, 811 F.2d 818, 827 (4th Cir. 1987)). Of course, "[a] presiding judge is not . . . required to recuse himself simply because of 'unsupported, irrational or highly tenuous speculation.'" Id. (quoting United States v. DeTemple, 162 F.3d 279, 287 (4th Cir. 1998)). Nor must a presiding judge "recuse himself simply because he possesses some tangential relationship to the proceedings." Id. Such overly-cautious recusals would improperly allow litigants to exercise a "negative veto" over the assignment of judges merely by asserting the attenuated hint of

---

circuit precedent. See Holmes v. United States, 284 F.2d 716 (4th Cir. 1960), in which we addressed a request for a new trial based on evidence of an improper communication by a court official to members of a jury, and held that the generally applicable standard governing whether new evidence bears upon a substantive issue of guilt should not apply when the new evidence "bears instead upon the integrity of the jury's verdict in the completed trial." Id. at 720.

impropriety.  See DeTemple, 162 F.3d at 287.  Instead, the judge must simply ask "whether another with knowledge of all of the circumstances might reasonably question the judge's impartiality."  Cherry, 330 F.3d at 665 (internal quotation omitted).

Comparing the facts of this case with relevant precedent demonstrates that the district judge did not abuse his discretion by refusing to recuse himself in this case.  In In re Beard, 811 F.2d at 828, the judge was the neighbor of a party in a bankruptcy proceeding and had called that party "a fine man" on the record.  We held that those facts did not provide a "reasonable basis for questioning the judge's impartiality."  Id.  In DeTemple, the judge in a bankruptcy fraud proceeding had previously represented one of the defendant's creditors.  162 F.3d at 287.  We held that this fact did not mandate recusal, in part because the judge's representation of the creditor ended two years before the defendant filed for personal bankruptcy and five years prior to defendant's indictment.  Id.  In United States v. Cole, 293 F.3d 153, 164 (4th Cir. 2002), we held that a trial judge did not abuse his discretion in refusing to recuse himself from a case in which one of the witnesses was the judge's godparents' son whom the judge had not seen in ten years.  Id.  Finally, in Cherry, the judge did not abuse his discretion by refusing to recuse himself from a bank fraud trial in which the deceased victim had provided support for the judge's appointment to the federal bench ten years before the

14

trial, and the judge had responded with a letter of appreciation. Cherry, 330 F.3d at 666.

As in the cases cited above, a reasonable person reviewing the facts of this case would not question the judge's impartiality. First, the judge had no relationship with Resource Bank or Armada Hoffler, the two corporate entities actually injured by the Agnews' fraud. The judge's relationship was instead more attenuated, consisting of a prior partnership with Daniel Hoffler and A. Russell Kirk, individuals who had ties to Armada Hoffler and Resource Bank, respectively.

The partnership at issue consisted of sixteen individuals: twelve partners in the judge's prior law firm and four real estate developers, including Mr. Hoffler and Mr. Kirk. The judge did not have an active role in the partnership, which was created to develop an office building to house the judge's law firm and other tenants. In fact, the judge held less than a three percent interest. The partnership itself had no relation to the Agnews or the fraud committed in this case. After the judge left private practice, he sold his interest in the partnership, completely divesting himself of ownership by January 1992--over ten years before the Agnews were indicted. It appears that the judge has had no personal or professional contact with the partnership, Resource Bank, Armada Hoffler, Mr. Kirk, or Mr. Hoffler in more than a decade.

15

In short, over ten years ago, the judge had a less than three percent interest in a partnership with two individuals who were later affiliated with corporate entities injured by the Agnews. A reasonable person, with knowledge of these relevant facts, would not reasonably question the judge's impartiality in this case. On these facts, we conclude that the judge did not abuse his discretion in denying the Agnews' Rule 33 motion for a new trial.[5]

## B.

We now turn to the Agnews' claim that the judgement was not based on sufficient evidence. When a motion for judgment of acquittal is based on insufficiency of the evidence, the verdict must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it. See Glasser v. United States, 315 U.S. 60, 80 (1942). Substantial evidence is defined as "that evidence which 'a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt.'" United States v. Newsome, 322 F.3d 328, 333 (4th Cir. 2003) (quoting United States

---

[5]Furthermore, while not dispositive, any allegations of judicial bias against the Agnews are belied by the fact that the judge was, by any objective measure, quite lenient toward the Agnews during the trial and the sentencing proceedings. He imposed their sentence at the low end of the sentencing range, reduced their sentence by an estimated 75 percent, allowed them to stagger their sentences so that one parent would remain free to take care of their children, and acquitted them on 4 counts.

16

v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)). This Court "must consider circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established." United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982). The Court does not review the credibility of witnesses, and it must assume that the finder of fact resolved all evidentiary contradictions in the Government's favor. United States v. Wilson, 115 F.3d 1185, 1190 (4th Cir. 1997). A defendant challenging the sufficiency of the evidence faces a heavy burden. See United States v. Beidler, 110 F.3d 1064, 1067 (4th cir. 1997). "[A]n appellate court's reversal of a conviction on grounds of insufficient evidence should be 'confined to cases where the prosecution's failure is clear.'" United States v. Jones, 735 F.2d 785, 791 (4th Cir. 1984) (quoting Burks v. United States, 437 U.S. 1, 17 (1978)).

1.

The Agnews challenge the bank fraud convictions on the basis that Resource implicitly acquiesced in their conduct by accepting invoices it knew did not reflect work performed. They contend they did not deceive Resource because the submission of such invoices was an accepted course of dealing under the CFM program.

However, this argument provides little aid to the Agnews. In order to prove a violation of 18 U.S.C. § 1344(1), the government

17

must demonstrate that the accused executed a scheme to defraud a federally insured or chartered bank and that the accused did so knowingly. United States v. Brandon, 298 F.3d 307, 311 (4th Cir. 2002). The CFM documents make clear that payment is authorized only upon the submission of a valid invoice. Generally, it is sufficient for fraud to demonstrate a defendant's knowledge that the invoice does not qualify for payment. Cf. Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 238-41 (2d Cir. 1999) (finding that contractor's representation of a conditional consignment as invoice for firm sales in an effort to obtain payment from a factor sufficient to demonstrate fraudulent misrepresentation). That condition is met here. Further, the Agnews have shown no authorization, either oral or written, to seek payment on invoices for work not performed; rather, they rely on the fact that their increasingly brazen series of misrepresentations passed without notice.

Generally, for a course of performance to demonstrate mutual assent to a modification, it must be "unequivocally referable" to the modification, and for conduct to amount to a waiver or estoppel, it "must not otherwise be compatible with the agreement as written;" rather, "the conduct of the parties [must] evidence [] an indisputable mutual departure from the written agreement." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 783 (2d Cir. 2003) (discussing New York law) (internal quotations omitted).

18

Here, however, the conduct on which the Agnews relies does not rise to this level, as Resource did begin to question their invoices when an audit revealed their fraud. Ultimately, the fact that the Agnews were able to get away with submitting facially fraudulent invoices (including some that were certified for work that, according to the invoice, would not be completed for fifteen to thirty days in the future) does not absolve them from engaging in that practice in the first place. Indeed, had they not, it is unlikely that the loss attributable to their fraud would have been so large. Thus, the bank convictions are amply supported by the evidence.

2.

The Agnews further challenge their convictions for embezzling 401(k) funds. They assert that there is no evidence that Mr. Agnew had any involvement in failing to remit or improperly withholding payments from the 401(k) plan. Further, they argue that the evidence supporting Barbara Agnew's conviction is legally insufficient, as her testimony contradicts that of Lundberg, who might be motivated to lie. The record belies both assertions.

The evidence clearly and unambiguously demonstrates that AGM was in dire financial straits in 1997, when it owed $2 million to vendors. The evidence is also compelling that the Agnews ran their business jointly. Two witnesses specifically testified that the

19

Agnews jointly decided who got paid and who did not, and that both spouses participated in that process. There is also testimony from one of AGM's project managers to the effect that Michael Agnew knew that AGM was not funding the 401(k) plan, promised to take care of it, and did not.

The evidence against Barbara Agnew is stronger. Although she attempts to blame the failure to make payments on Lundberg's "disorganization," there is ample reason to discredit Mrs. Agnew's testimony. A witness other than Lundberg testified as to the conference call between Mrs. Agnew and Putnam, in which the Agnew's failure to fund the 401(k) plan was discussed, and during which she promised to make full payment on the underfunded portion of the plan and to start making regular payments again. After that, Mrs. Agnew failed to respond to contacts regarding the repeated failure to remit payment.

While the Agnews insist that there was no intent to defraud, the ambit of 18 U.S.C. § 664 "includes a taking or appropriation that is unauthorized, if accomplished with specific criminal intent." United States v. Wiseman, 274 F.3d 1235, 1240 (9th Cir. 2001) (internal quotations omitted). Significantly, while "the defendant must knowingly act wrongfully to deprive another of property, there is no requirement that the defendant also know his conduct was illegal." Id. (internal quotations omitted). Moreover, once the trier of fact has made a credibility

20

determination, that decision cannot be revisited on appeal, even after a bench trial. <u>United States v. Romer</u>, 148 F.3d 359, 364 (4th Cir. 1998); <u>United States v. Bales</u>, 813 F.2d 1289, 1293 (4th Cir. 1987). Reviewing the evidence, there is no merit to the the Agnews' challenge to the adequacy of evidence as to withholding AGM's mandatory contributions from its employees' 401(k) plan.

## III.

In conclusion, the district court did not err in denying the Agnews' motion for a new trial based upon newly discovered evidence of judicial bias, and their motion for a judgment of acquittal. Accordingly, the convictions are

<u>AFFIRMED</u>.